IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 14, 2005 Session

**IN THE MATTER OF
THE CONSERVATORSHIP OF DORIS DAVENPORT
DORIS DAVENPORT, ET AL. v. RUTH ADAIR, ET AL.**

**Direct Appeal from the Probate and Family Court for Cumberland County
No. 14260      Steven C. Douglas, Judge**

---

**No. E2004-01505-COA-R3-CV - FILED DECEMBER 27, 2005**

---

In this conservatorship case, we are asked to evaluate the probate court's decision that an elderly female was mentally disabled and in need of the court's assistance. The elderly female executed two powers of attorney for health care; one in 1996 and the other in 2003 after the nieces of the elderly female filed their petition in this case to appoint a conservator. The attorney-in-fact under both powers of attorney filed a counter-petition asking the probate court to appoint her conservator over the elderly female. The probate court ruled that the power of attorney executed in 1996 was void due to improper execution and that the power of attorney executed in 2003 was void because it was executed while the elderly female was mentally disabled. The probate court found that the elderly female's nieces and the attorney-in-fact should not serve as conservators in this case. Instead, the probate court appointed the public guardian to serve as the elderly female's conservator. The attorney-in-fact and the elderly female filed an appeal to this Court. We affirm in part and reverse in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Probate and Family Court
Affirmed in Part; Reversed in Part**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Matthew B. Frére, D. David Sexton, Knoxville, TN, for Appellant, Doris Davenport

Paul T. Coleman, Irmie K. (Ike) Blanton, III, Knoxville, TN, for Appellant, Teddie J. Clark

David O. Day, Edward M. Graves, III, Cookeville, TN, for Appellees

# OPINION

## I.
### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At the center of the present controversy is Doris L. Davenport ("Ms. Davenport"), an elderly female resident of Crossville, Tennessee born on November 23, 1911. On April 11, 1996, Ms. Davenport executed a document entitled "Durable Power of Attorney" (hereinafter referred to as the "1996 Power of Attorney") which provided, in relevant part, as follows:

> I, DORIS L. DAVENPORT, of Cumberland County, Tennessee, in the event that I should become incapacitated, as hereinafter defined, do hereby appoint NOEL D. CLARK, SR., as my true and lawful attorney in fact, if he is unable to serve then I hereby appoint TEDDIE JANE CLARK, as my alternate true and lawful attorney in fact.
>
> . . . .
>
> I also express my desire that should a court deem it necessary to commence legal proceedings over my estate and its management, it is my wish that NOEL D. CLARK, SR., serve as my conservator or guardian.

The 1996 Power of Attorney also purported to empower the attorney in fact with the ability to handle Ms. Davenport's financial matters in the event of her incapacitation. Two witnesses signed the following acknowledgment attached to the 1996 Power of Attorney:

> I declare that DORIS L. DAVENPORT, is personally known to me, that she signed this Durable Power of Attorney in my presence, and that she appears to be of sound mind and under no duress, fraud or undue influence, I am not the person appointed as agent by this document, nor am I the health care provider or an employee of the health care provider for DORIS L. DAVENPORT.
> I further declare that I am not related to DORIS L. DAVENPORT, by blood, marriage, or adoption, and to the best of my knowledge, I am not entitled to any part of her estate under a will now existing or by operation of law.

The notary, who also happened to be one of the witnesses, affixed her signature to the document indicating that she and the other witness subscribed to the aforementioned declaration in her presence. On the same day that she executed the 1996 Power of Attorney, Ms. Davenport also executed the "Doris L. Davenport Revocable Inter Vivos Trust" (hereinafter referred to as the "1996

Inter Vivos Trust") naming Noel D. Clark, Sr. as co-trustee. In 1999, Ms. Davenport named a successor trustee to serve in the event of the death or incapacity of Noel D. Clark, Sr., and she named Teddie Jane Clark ("Ms. Clark") to serve as co-trustee in the event of the successor trustee's death, incapacity, or resignation.

Ms. Clark served as a legal secretary to Noel D. Clark, Sr., Ms. Davenport's attorney, prior to their marriage. In 1999, the successor trustee to the 1996 Inter Vivos Trust resigned. On February 10, 2000, Noel D. Clark, Sr. died, and, as a result, Ms. Clark became the co-trustee over the 1996 Inter Vivos Trust and attorney-in-fact for Ms. Davenport under the 1996 Power of Attorney. In November of 2001, doctors diagnosed Ms. Davenport with having an inoperable brain tumor. Thereafter, Ms. Clark began to take on a more active role in Ms. Davenport's daily care.

On October 15, 2002, Ruth Adair ("Mrs. Adair") and Elizabeth Hollingsworth ("Ms. Hollingsworth"), Ms. Davenport's nieces (hereinafter collectively referred to as the "Nieces" or "Appellees"), filed a "Petition for Appointment of Conservator of the Person and Property of Doris Davenport" in the Probate Court of Cumberland County, Tennessee. Therein, the Nieces alleged that Ms. Davenport suffered from dementia and paranoid delusions from advanced age and was in need of a conservator. The Nieces requested that the probate court appoint them conservators over Ms. Davenport, and they requested that the court appoint attorney C. Douglas Fields ("Mr. Fields") to serve as the guardian ad litem for Ms. Davenport. The Nieces also asked the probate court to order Ms. Davenport to undergo a medical examination, citing her refusal to submit to such examination. The probate court subsequently entered an order directing Ms. Davenport to submit to a medical examination by Dr. Reynaldo A. Olaechea ("Dr. Olaechea") and an order appointing Mr. Fields to serve as guardian ad litem for Ms. Davenport to investigate the Nieces' petition.

Dr. Olaechea subsequently evaluated Ms. Davenport and submitted his report to the probate court indicating that Ms. Davenport suffered from the following medical problems: a brain tumor, an old myocardial infarction, generalized arteriosclerosis, senility, osteoarthritis, and difficulty hearing. Dr. Olaechea recommended that the probate court appoint a conservator for Ms. Davenport because she "is not able to take care of her health or her affairs due to physical and mental handicaps. . . . In the event that her mind gets worse, she needs to sign papers for a nursing facility." Dr. Olaechea also noted that Ms. Davenport's brain tumor, while benign, "is growing slowly and may produce severe mental incapacity in time."

On January 7, 2003, Ms. Clark filed a "Petition to Intervene" in the matter noting that, pursuant to the 1996 Power of Attorney, her ability to act as Ms. Davenport's attorney-in-fact could be impaired by a disposition of the Nieces' petition. Ms. Clark also filed a response to the Nieces' petition alleging that Ms. Davenport did not need the assistance of the court, and she asked the probate court to dismiss the Nieces' petition asserting that Ms. Davenport had the requisite capacity to execute the 1996 Power of Attorney and 1996 Inter Vivos Trust. Alternatively, Ms. Clark asserted that, if the court found Ms. Davenport to be in need of the court's assistance, the court should appoint Ms. Clark as conservator for Ms. Davenport because the 1996 Power of Attorney and 1996 Inter Vivos Trust evidenced Ms. Davenport's desire for Ms. Clark to fulfill that role. The Nieces

subsequently filed an answer to Ms. Clark's petition and asked the court to dismiss the petition for the following reasons: (1) the 1996 Power of Attorney amounted to a nullity since it was improperly executed, specifically that one of the witnesses was also the notary, and the witnesses did not swear "under penalty of perjury" as required by statute; and (2) Ms. Clark did not have standing to intervene because the Nieces had statutory priority for appointment as Ms. Davenport's conservators. Ms. Clark subsequently filed an amended petition to intervene asserting that the 1996 Power of Attorney and the 1996 Inter Vivos Trust qualified as writings signed by Ms. Davenport, as contemplated by section 34-3-103(1) of the Tennessee Code, thereby establishing her preference for Ms. Clark to serve as her conservator.

In March of 2003, the probate court held a hearing on Ms. Clark's petition to intervene in the matter. Shortly thereafter, the probate court entered an order denying her petition and stating that the 1996 Power of Attorney was "a springing power of attorney with specific conditions precedent incorporated within its terms that by admission have not been met and it is therefore not currently in effect." Ms. Clark subsequently filed a "Motion for Interlocutory Appeal," which the probate court denied.

At some point during the pendency of the litigation, Ms. Davenport secured the services of Dr. Victor Schueler ("Dr. Schueler"), a geriatric psychiatrist and medical doctor. On March 26, 2003, Ms. Davenport filed an answer to the Nieces' petition to appoint a conservator asserting that she did not need the assistance of the court, and she requested that the probate court dismiss the Nieces' petition. On July 17, 2003, Ms. Clark filed a competing "Petition for Appointment of Conservator" in the probate court asserting that, if the probate court found Ms. Davenport to be disabled and in need of assistance, then the court should appoint Ms. Clark as her conservator. In support of her petition, Ms. Clark cited to the directive of Ms. Davenport in the 1996 Power of Attorney. Ms. Clark also noted that Ms. Davenport designated Ms. Clark to serve as her conservator in documents she executed in 2003. Specifically, Ms. Davenport signed a document entitled "Durable Power of Attorney for Health Care Regarding Doris L. Davenport" on March 7, 2003, which provided, in relevant part, as follows:

> I, DORIS L. DAVENPORT, . . . do appoint TEDDIE JANE CLARK as my true and lawful attorney-in-fact to act on my behalf for health care, as provided herein.
>
> . . . .
>
> NOMINATION OF CONSERVATOR. My attorney-in-fact, Teddie J. Clark, is nominated to serve as my conservator or guardian, should one be appointed by a court of competent jurisdiction.

That same day, Ms. Davenport signed a document entitled "Durable Power of Attorney Regarding Doris L. Davenport" (hereinafter collectively referred to as the "2003 Powers of Attorney") which purported to appoint Ms. Clark as Ms. Davenport's attorney-in-fact over her property. The Nieces

filed a motion to strike Ms. Clark's petition and a corresponding motion in limine asking the probate court to rule that the documents executed by Ms. Davenport on March 7, 2003 were inadmissible at trial.

On July 23, 2003, the probate court held a hearing on the Nieces' petition for the appointment of a conservator for Ms. Davenport. The court heard from numerous witnesses during the hearing, including Ms. Davenport. Shortly thereafter, the probate court entered an order ruling as follows:

> The Petitioners have carried their burden of proof by clear and convincing evidence that the Respondent does have a disability that would require certain of her rights to be removed from her. The Respondent should not be deprived of her right to vote. However, her ability to make financial decisions, her ability to dispose of property, to execute contracts or other legal instruments, and her ability to consent to medical and mental examinations and treatment or hospitalizations is impaired and a conservator should be appointed to manage those matters. The Court further finds the respondent should not be allowed to have a drivers license.
> A competing petition for conservatorship having been recently filed, the Court finds that the original Petitioners should have time to conduct discovery in regard to the competing Petitioner Teddie Clark so the determination of who the conservator will be is reserved. . . . The Court further finds the 2003 Powers of Attorney filed with the petition of Teddie Clark are not effective and will not be recognized because the disabling characteristics existed prior to their execution.

In the same order, the probate court denied the Nieces' motion to strike Ms. Clark's petition and their motion in limine.

Thereafter, the parties filed numerous motions and responses thereto with the probate court. However, we are only concerned with one of these motions on appeal. Ms. Clark filed a motion asking the probate court to remove Mr. Fields as guardian ad litem alleging that he had not been appointed pursuant to section 34-1-107 of the Tennessee Code or the local rules of the probate court and that he failed to perform adequately his duties as guardian ad litem. On August 15, 2003, the probate court entered an order denying Ms. Clark's motion to remove the guardian ad litem. The probate court also ordered *sua sponte* that "Upper Cumberland Development District, Office of Public Guardian, Agent Kelly Tayes [(hereinafter referred to as the "Public Guardian")] is appointed as Conservator of the person and property of Doris L. Davenport from the present until the court appoints a permanent conservator." On the same day that the trial court entered the order addressing Ms. Clark's motion, she filed a "Complaint for Declaratory Judgment" in the Chancery Court of Cumberland County asking the court to declare the rights and obligations of the parties under the 1996 Power of Attorney and the 2003 Powers of Attorney. The chancery court subsequently transferred the complaint to the probate court.

On May 17, 2004, the probate court entered an order in this matter wherein the court ruled, in relevant part, as follows:

> After hearing arguments of counsel [on April 28, 2004], the Court announced findings of fact and conclusions of law. A transcript of the arguments and ruling is separately filed with the Clerk and hereby incorporated by reference in this Order. Based upon said rulings, this Court hereby ORDERS:
>
> 1. Upon remand of the Declaratory Judgment from the [chancery court], the Declaratory Judgment was consolidated in the Conservatorship action referenced above. The following findings of facts, conclusions of law, and the rulings set forth hereinafter dispose of all claims set forth in the Declaratory Judgment action, and the Conservatorship action.
>
> . . . .
>
> 4. The Court clarified a prior ruling that the 2003 Powers of Attorney were executed after Mrs. Davenport was determined to be disabled by her doctor, making those documents invalid.
>
> 5. The Court found that the 1996 power of attorney was not executed under penalty of perjury as required by statute; that one of the witnesses purports to notarize her own signature; and that the [Public Guardian's] action in revoking the financial power of attorney was proper; and that the language in the [1996 Power of Attorney] authorizing the appointment of a conservator named "Noel Clark" and not "Teddie Jane Clark" as the person she desired to be appointed. Based upon the above findings of fact, the Court orders that the 1996 power of attorney is void; is not properly executed and can't be considered for any purpose; and that the [Public Guardian] had the power to revoke the provisions dealing with the conservator.
>
> 6. Based upon an examination of the facts as they relate to the priority of persons to be appointed as Conservator pursuant to T.C.A. section 34-3-103, the court finds that there is no spouse; there are no children, that the petitioning nieces are not appropriate because they have family frictions with Mrs. Davenport; and that Teddie Jane Clark is not appropriate for appointment because of financial improprieties. It is in the best interest of Doris L. Davenport pursuant to T.C.A. § 34-3-103 that the [Public Guardian] be and is hereby appointed as the Conservator of the person and property of Doris L. Davenport.

The probate court went on to set forth the parameters of the Public Guardian's responsibilities regarding Ms. Davenport.

## II.
### ISSUES PRESENTED

Ms. Davenport and Ms. Clark filed timely notices of appeal to this Court seeking appellate review of the trial court's rulings. Ms. Davenport presents the following issue for review:

1.      Whether the evidence presented at trial clearly and convincingly established that Ms. Davenport is disabled and in need of the assistance of the court.

Ms. Davenport is joined by Ms. Clark in presenting the following issues:

2.      If the record does establish that Ms. Davenport is in need of a conservator, whether the trial court erred in appointing the Public Guardian as her conservator over Ms. Clark;
3.      Whether the trial court erred in finding the 1996 Power of Attorney to be invalid; and
4.      Whether the trial court erred in finding the 2003 Powers of Attorney to be invalid.

Ms. Clark presents the following issues for our review:

5.      Whether the trial court erred in finding that Ms. Clark engaged in "financial improprieties"; and
6.      Whether the trial court erred by denying Ms. Clark's motion to remove the guardian ad litem.

For the reasons stated more fully herein, we affirm in part and reverse in part the decision of the probate court.

## III.
### STANDARD OF REVIEW

When evaluating the issues presented by the parties in this appeal, we are cognizant of the following:

> Appellate courts . . . may need to apply more than one standard of review when reviewing a lower court's decision appointing a conservator. To explain, a petition for the appointment of a conservator requires the lower court to make legal, factual, and discretionary determinations. Each of these determinations require different standards of review.

-7-

*Crumley v. Perdue*, No. 01-A-01-9704-CH-00168, 1997 Tenn. App. LEXIS 774, at *7 (Tenn. Ct. App. Nov. 7, 1997).

"Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d) (2005). When reviewing a trial court's factual findings which derive from the testimony of witnesses, we are bound by the following legal principle:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics. Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

We review a trial court's conclusions of law under a purely *de novo* standard of review, affording no presumption of correctness to those findings. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing ***Estate of Adkins v. White Consol. Indus., Inc.***, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)). Regarding those decisions which are within the discretion of a trial court, we employ the following standard of review:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *see also State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

In this appeal, we are also called upon to interpret certain statutes. "Statutory interpretation is a question of law, which we review *de novo*, with no presumption of correctness given to the courts below." *Sullivan v. Edwards Oil Co.*, 141 S.W.3d 544, 547 (Tenn. 2004) (citing *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003)). When interpreting statutory language, we also employ the following principles to guide us in our endeavor:

> In construing any statute, our "essential duty" is "'to ascertain and carry out the legislature's intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Lavin v. Jordon*, 16 S.W.3d 362, 365 (Tenn. 2000) (quoting *Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc.*, 978 S.W.2d 91, 93 (Tenn. 1998)). When the language of a statute is clear and unambiguous, "legislative intent is to be ascertained from the plain and ordinary meaning of the statutory language used." *Gragg v. Gragg*, 12 S.W.3d 412, 415 (Tenn. 2000). However, when this court finds that (1) a statute can legitimately be construed in various ways, and (2) one of those constructions presents a constitutional conflict, then "it is our duty to adopt a construction which will sustain the statute and avoid [that] constitutional conflict, if its recitations permit such a construction." *Marion County Bd. of Comm'rs v. Marion County Election Comm'n*, 594 S.W.2d 681, 684-85 (Tenn. 1980). In no case, though, is the judiciary empowered to substitute its own policy judgments for those of the General Assembly or to adopt a construction that is clearly contrary to the intent of the General Assembly. *See*, *e.g.*, *Griffin v. Shelter Mut. Ins. Co.*, 18 S.W.3d 195, 201 (Tenn. 2000).

*State v. Mallard*, 40 S.W.3d 473, 480 (Tenn. 2001).

# IV.
## DISCUSSION

### A.
### *The Need for a Conservator*

"The purpose of appointing a guardian, conservator, or committee is to safeguard the rights of the incompetent by protecting his person and by managing and preserving his property." 57 C.J.S. *Mental Health* § 110 (1992); *see also In re Conservatorship of Groves*, 109 S.W.3d 317, 329 (Tenn. Ct. App. 2003) ("Conservatorship proceedings provide a forum for determining whether a person's

ability to remain autonomous has become impaired."); *In re Armster*, No. M2000-00776-COA-R3-CV, 2001 Tenn. App. LEXIS 797, at *12 (Tenn. Ct. App. Oct. 25, 2001) (citing **Bell v. Icard**, 986 S.W.2d 550, 557 (Tenn. 1999)) ("[T]he purpose of a conservatorship proceeding is to determine whether a person is disabled such that she needs a court-appointed fiduciary to supervise, protect, and assist her person, her property, or both."). The legislature defines a "conservator" as "a person or persons appointed by the court to provide partial or full supervision, protection and assistance of the person or property or both of a disabled person." Tenn. Code Ann. § 34-1-101(4) (2003). Further, it defines a "disabled person" as "any person eighteen (18) years of age or older determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity." Tenn. Code Ann. § 34-1-101(7) (2003).

Before the court may appoint a conservator over the person or property of an individual, the petitioner must prove the following by clear and convincing evidence: (1) that the individual for whom the conservatorship is sought "is fully or partially disabled," and (2) that the individual for whom the conservatorship is sought "is in need of assistance from the court." Tenn. Code Ann. § 34-1-126 (2003); *see also Hendrix v. McGill*, No. 01A01-9709-PB-00536, 1998 Tenn. App. LEXIS 275, at *5–6 (Tenn. Ct. App. Apr. 29, 1998); **Crumley v. Perdue**, No. 01-A-01-9704-CH-00168, 1997 Tenn. App. LEXIS 774, at *5 (Tenn. Ct. App. Nov. 7, 1997). This Court has previously addressed the clear and convincing evidence standard, stating:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). "Thus, in involuntary conservatorship proceedings, the burden of proof is on the person or persons petitioning for the appointment of a conservator." **In re Conservatorship of Groves**, 109 S.W.3d at 330.

On appeal, Ms. Davenport argues that the Nieces failed to carry their burden at trial of proving the existence of the first prong of the statute (*i.e.*, that she is a disabled person) by clear and convincing evidence. In their petition, the Nieces alleged that Ms. Davenport suffered from dementia and paranoid delusions. Ms. Davenport asserts that the only medical evidence at trial regarding her mental capacity came from her own expert, Dr. Schueler, who testified that she is competent to care for herself. She contends that, since the Nieces failed to present medical proof of a mental disability, the trial court erred in finding that the record contained clear and convincing evidence to support its finding of such a disability. Conversely, the Nieces contend that the probate court did have medical proof in the form of Dr. Olaechea's affidavit to support its finding that Ms. Davenport is disabled due to her mental incapacity. Moreover, the Nieces assert that there are no Tennessee statutes or cases requiring that a petitioner prove the existence of a disability with expert medical testimony.

## 1.
### The Probate Court's Consideration of the Medical Report

We begin by evaluating the trial court's evidentiary ruling regarding the "Medical Examination Report" filed by Dr. Olaechea in this case. The legislature directs that a petition for the appointment of a conservator should contain, among other things, the following:

> (7) The name of the respondent's physician or, where appropriate, respondent's psychologist and either:
>> (A) A sworn medical examination report described in § 34-3-105(c);
>> (B) A statement that the respondent has been examined but the sworn medical examination report has not been received but will be filed before the hearing; or
>> (C) A statement that the respondent refuses to be examined voluntarily, with a request that the court direct the respondent to submit to medical examination[.]

Tenn. Code Ann. § 34-3-104(7) (2003). In the instant case, the Nieces indicated in their petition that Ms. Davenport refused to undergo a medical examination. At the Nieces' request, the probate court ordered Ms. Davenport to undergo a medical examination by Dr. Olaechea pursuant to section 34-3-105 of the Tennessee Code, which provides:

> (a) If the respondent has been examined by a physician or, where appropriate, a psychologist not more than ninety (90) days prior to the filing of the petition and the examination is pertinent, the report of the examination shall be submitted with the petition. If the respondent has not been examined within ninety (90) days of the

-11-

filing of the petition, cannot get out to be examined or *refuses to be voluntarily examined*, the court shall order the respondent to submit to examination by a physician or, where appropriate, a psychologist identified in the petition as the respondent's physician or psychologist or, if the respondent has no physician or psychologist, a physician or psychologist selected by the court. The physician or psychologist on completing the examination shall send a sworn written report to the court with copies to the petitioner and the guardian ad litem. *The physician's or psychologist's report shall be made a part of the court record*.

(b) On motion by the petitioner, the respondent, the adversary counsel, the guardian ad litem, or on its own initiative, the court may order the respondent to submit to examination by such physicians and psychologists or other specialists who have expertise in the specific disability of the respondent. The examining person shall send a sworn written report to the court with copies to the petitioner, the guardian ad litem and the person requesting the second examination. The court may assess the cost of the second examination against the property of the disabled person or against the person requesting the examination.

(c) Each physician's or psychologist's sworn report shall contain the following:

(1) The respondent's medical history;

(2) A description of the nature and type of the respondent's disability;

(3) An opinion as to whether a conservator is needed and the type and scope of the conservator with specific statement of the reasons for the recommendation of conservatorship; and

(4) Any other matters as the court deems necessary or advisable.

Tenn. Code Ann. § 34-3-105 (2003) (emphasis added). Dr. Olaechea subsequently evaluated Ms. Davenport and filed his report with the probate court recommending that a conservator be appointed over Ms. Davenport due to her inability to care for her health and affairs because of physical and mental handicaps.

At the July 2003 hearing to determine whether Ms. Davenport was in need of a conservator, the Nieces attempted to introduce Dr. Olaechea's "Medical Examination Report" into evidence. Counsel for Ms. Davenport promptly objected to the introduction of the report as hearsay. Referencing the statute, the probate court and counsel for the parties debated whether the probate court could properly consider the report as evidence since it was made a part of the record pursuant to the statute. *See* Tenn. Code Ann. § 34-3-105(a) (2003). The probate court overruled Ms. Davenport's objection and ruled that it could consider the report when making a determination as

to whether Ms. Davenport was disabled since it was a part of the record pursuant to the statute. Specifically, the probate court ruled that "[i]t's part of the record, and I indicated that I will be considering that as evidence, over their objections." Ms. Davenport contends on appeal that this ruling constitutes error since the probate court could consider only the evidence properly admitted at trial when rendering a decision in this case. We agree.

The Tennessee Rules of Evidence "shall govern evidence rulings in all trial courts of Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee." Tenn. R. Evid. 101 (2005). A strict reading of section 34-3-105(a) of the Tennessee Code (*i.e.*, that it requires the admission of a physician's or psychologist's report in conservatorship cases regardless of objections based upon evidentiary rules related to hearsay, relevance, reliability of expert opinion, authentication, etc.) would seemingly place it in direct conflict with the Tennessee Rules of Evidence. "[W]hile the three branches of government are independent and co-equal, they are to a degree interdependent as well, with the functions of one branch often overlapping that of another." **State v. King**, 973 S.W.2d 586, 588 (Tenn. 1998) (citing **Underwood v. State**, 529 S.W.2d 45, 47 (Tenn. 1975)). Thus, we must determine whether the legislature's directive that a "physician's or psychologist's report shall be made a part of the court record" in conservatorship cases constitutes an impermissible encroachment into the province of the judiciary in violation of the separation of powers doctrine. *See* **Martin v. Lear Corp.**, 90 S.W.3d 626, 631 (Tenn. 2002) (noting that "the legislature has no constitutional authority to enact rules that strike at the heart of the court's exercise of judicial power").

The Tennessee Supreme Court has previously addressed an apparent conflict between a statute and the Tennessee Rules of Evidence, stating:

> The authority of the General Assembly to enact rules of evidence in many circumstances is not questioned by this Court. Its power in this regard, however, is not unlimited, and any exercise of that power by the legislature must inevitably yield when it seeks to govern the practice and procedure of the courts. Only the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state, *see, e.g.*, *State v. Reid*, 981 S.W.2d 166, 170 (Tenn. 1998) ("It is well settled that Tennessee courts have inherent power to make and enforce reasonable rules of procedure."); *see also* Tenn. Code Ann. §§ 16-3-401, -402 (1994), and this inherent power "exists by virtue of the establishment of a Court and not by largess of the legislature," *Haynes v. McKenzie Mem'l Hosp.*, 667 S.W.2d 497, 498 (Tenn. Ct. App. 1984). Furthermore, because the power to control the practice and procedure of the courts is inherent in the judiciary and necessary "to engage in the complete performance of the judicial function," *cf. Anderson County Quarterly Court v. Judges of the 28th Judicial Cir.*, 579 S.W.2d 875, 877 (Tenn. Ct. App. 1978), this power cannot be

-13-

constitutionally exercised by any other branch of government, *see* Tenn. Const. art. II, § 2 ("No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."). In this area, "the court is supreme in fact as well as in name." *See Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976).

Despite the clear expression of the separation of powers doctrine in Article II and elsewhere, however, "it is impossible to preserve perfectly the 'theoretical lines of demarcation between the executive, legislative and judicial branches of government.' Indeed there is, by necessity, a certain amount of overlap because the three branches of government are interdependent." *Petition of Burson*, 909 S.W.2d 768, 774 (Tenn. 1995). In recognition of this important principle, we have frequently acknowledged the broad power of the General Assembly to establish rules of evidence in furtherance of its ability to enact substantive law. *See Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739, 743 (Tenn. 1965). But as the General Assembly can constitutionally exercise only the legislative power of the state, its broad ability to enact rules for use in the courts must necessarily be confined to those areas that are appropriate to the exercise of that power. Although any discussion of the precise contours of this legislative power is not appropriate in this case, it is sufficient to acknowledge that such power exists and that it is necessarily limited by the very nature of the power itself.

Notwithstanding the constitutional limits of legislative power in this regard, the courts of this state have, from time to time, consented to the application of procedural or evidentiary rules promulgated by the legislature. Indeed, such occasional acquiescence can be expected in the natural course of events, as this practice is sometimes necessary to foster a workable model of government. *When legislative enactments (1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court, then considerations of comity amongst the coequal branches of government counsel that the courts not turn a blind eye. See Newton v. Cox*, 878 S.W.2d 105, 112 (Tenn. 1994) (upholding legislative regulation of attorneys when the regulation (1) did not "directly conflict with the Supreme Court's authority," and (2) was merely "designed to declare" public policy). This Court has long held the view that comity and cooperation among the branches of government are beneficial to all, and consistent with constitutional principles, such practices are desired and ought to be nurtured and maintained. While it is sometimes difficult to practically ascertain where Article

II, section 2 draws the line, the distinction may be simply stated as that between cooperation and coercion. *See Phoenix Newspapers, Inc. v. Superior Court*, 180 Ariz. 159, 882 P.2d 1285, 1290 (Ariz. Ct. App. 1993).

*State v. Mallard*, 40 S.W.3d 473, 480–82 (Tenn. 2001) (emphasis added). However, the supreme court noted that a legislative enactment may unconstitutionally infringe upon the province of the judiciary in some instances, stating:

Just as the General Assembly has no constitutional power to enact rules that infringe upon the protections of the Declaration of Rights, *State v. Pilkey*, 776 S.W.2d 943, 951 (Tenn. 1989); *Tennessee Dep't of Hum. Servs. v. Vaughn*, 595 S.W.2d 62, 63 (Tenn. 1980), *the legislature can have no constitutional authority to enact rules*, *either of evidence or otherwise*, *that strike at the very heart of a court's exercise of judicial power*, *see People v. Jackson*, 69 Ill. 2d 252, 371 N.E.2d 602, 604, 13 Ill. Dec. 667 (Ill. 1977) ("If the power is judicial in character, the legislature is expressly prohibited from exercising it."). Among these inherent judicial powers are the powers to hear facts, to decide the issues of fact made by the pleadings, and to decide the questions of law involved. *See Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641, 645 (Tex. 1933). As an essential corollary to these principles, any determination of what evidence is relevant, either logically or legally, to a fact at issue in litigation is a power that is entrusted solely to the care and exercise of the judiciary. *See Opinion of the Justices*, 141 N.H. 562, 688 A.2d 1006, 1016 (N.H. 1997). Indeed, a "court's constitutional function to independently decide controversies is impaired if it must depend on, or is limited by, another branch of government in determining and evaluating the facts of the controversies it must adjudicate." *Id*. Consequently, any legislative enactment that purports to remove the discretion of a trial judge in making determinations of logical or legal relevancy impairs the independent operation of the judicial branch of government, and no such measure can be permitted to stand.

*Id*. at 483 (emphasis added).

We must presume that the statutory language at issue is constitutional and that the legislature did not intend to infringe upon the judicial authority of the courts of this state to control the admissibility of medical evidence in conservatorship proceedings. *See id*. We believe that the statutory language employed by the legislature in section 34-3-105(a) of the Tennessee Code is "reasonable and workable within the framework" of the Tennessee Rules of Evidence, therefore, it does not run afoul of the separation of powers doctrine. The legislature instructed that "[t]he

-15-

physician's or psychologist's report shall be made a part of the court *record*." Tenn. Code Ann. § 34-3-105(a) (2003) (emphasis added). "Our search for a statute's purpose begins with the words of the statute itself." *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995). In ascertaining the legislature's intent in enacting a statute, we must give the words selected by the legislature their plain and ordinary meaning. *See State v. Collins*, 166 S.W.3d 721, 725–26 (Tenn. 2005). Nowhere in the statute does the legislature direct that the report shall be admitted as evidence of disability and considered by the trial court without being tested by the evidentiary rules. In any given case, documents are filed with the trial court which are made a part of the *record* (*i.e.*, the complaint, the answer, motions, etc.), but they do not constitute evidence considered by the trier of fact when rendering a decision in the case. *See, e.g., Hillhaven Corp. v. State ex rel. Manor Care, Inc.*, 565 S.W.2d 210, 212 (Tenn. 1978) ("Allegations in pleadings are not, of course, evidence of the facts averred."); *Bobo v. Gregory*, No. 03A01-9408-CV-00280, 1995 Tenn. App. LEXIS 28, at *7 (Tenn. Ct. App. Jan. 13, 1995) (citations omitted) ("Pleadings do not constitute evidence.").

Moreover, the legislature has enacted the following provision regarding the opinions of medical professionals:

> In the trial of any civil suit, there shall be received in evidence if offered on behalf of any party thereto, opinions as to medical findings as a result of treatment or examination of the party, whether such opinions are based on subjective or objective findings; *provided such opinions are those of persons otherwise qualified as medical experts*. It is declared to be the intent of this section that medical opinions based on subjective findings are no longer to be excluded from evidence whether the opinion is from the treating expert or an expert called in for purposes of examination and evaluation.

Tenn. Code Ann. § 24-7-115 (2003) (emphasis added); *see also Johnson v. Schevenell Ready Mix, Inc.*, 608 S.W.2d 582, 584 (Tenn. 1980) ("Under the above statute, the opinion of a *qualified* medical expert witness based on subjective findings alone is sufficient to establish medical causation and the permanency of disability, if the evidence is found to be credible by the trial judge.") (emphasis added)). "[W]e cannot review a statute in a vacuum." *In re Estate of Luck*, No. W2004-01554-COA-R3-CV, 2005 Tenn. App. LEXIS 332, at *6 (Tenn. Ct. App. June 7, 2005) (no perm. app. filed). We must avoid a construction of a statute which would place it in conflict with or render it repugnant to another provision in the Tennessee Code. *See Tenn. Elec. Power Co. v. City of Chattanooga*, 114 S.W.2d 441, 444 (Tenn. 1937).

In the instant case, the Nieces never called Dr. Olaechea as a witness nor did they attempt to qualify him as an expert regarding his medical opinions. Instead, they simply attempted to admit his report at trial as conclusive evidence of Ms. Davenport's disability without having such evidence properly tested by the evidentiary rules. We conclude that the legislature did not intend for the reports of physicians and psychologists, which must be filed with the court in conservatorship proceedings pursuant to the statute at issue, to be admitted into evidence in contravention or in lieu

of the Tennessee Rules of Evidence and section 24-7-115 of the Tennessee Code. Accordingly, to the extent that the probate court relied on Dr. Olaechea's report as evidence to support its decision that Ms. Davenport suffered from a mental disability, we find error. *See State v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 Tenn. App. LEXIS 372, at *6–7 (Tenn. Ct. App. June 29, 2005) (finding that the trial court committed error by relying on documents filed with the court clerk, which were never properly admitted into evidence).

**2.**
**Other Evidence of Disability**

In spite of the inadmissibility of Dr. Olaechea's report, we must now determine whether the Nieces presented clear and convincing evidence that Ms. Davenport suffers from a mental disability so that the appointment of a conservator is warranted in this case. On appeal, Ms. Davenport, relying on the requirement that a physician's or psychologist's report must be filed in conservatorship proceedings, *see* Tenn. Code Ann. § 34-3-105 (2003), argues that the petitioner in a conservatorship proceeding *must* present expert medical testimony to establish the existence of a disability. In the alternative, Ms. Davenport argues that the lay testimony presented by the Nieces at trial failed to establish by clear and convincing evidence that she is disabled. We cannot agree with either of Ms. Davenport's assertions.

While the legislature requires a respondent in conservatorship proceedings to submit to "examination by a physician or, where appropriate, a psychologist," *see* Tenn. Code Ann. § 34-3-105 (2003), nowhere in Title 34 of the Tennessee Code do we find the requirement that petitioners in conservatorship cases must prove disability by expert medical proof, *see* Tenn. Code Ann. § 34-1-101 *et seq.* (2003). To the contrary, we find the following holding of the Superior Court of Pennsylvania to be instructive on this issue:

> Medical testimony is of great significance since it assists the trial court in determining the nature, severity, and consequences of an alleged incompetent's disability . . . . However, the appellate courts have never adopted a rule of evidence which would require the use of expert testimony in all incompetency proceedings without exception. The testimony of lay witnesses who have observed the alleged incompetent is admissible and highly probative since "[o]ne's mental capacity is best determined by his spoken words, his acts, and his conduct." *Urquhart Estate*, 431 Pa. 134, 142, 245 A.2d 141, 146 (1968). *See also Weir by Gasper v. Ciao*, 364 Pa.Super. 490, 494-495, 528 A.2d 616, 619-620 (1987) (court may base finding of competency on evidence provided by lay witness).
>
> Although the introduction of expert testimony from psychiatrists, psychiatric nurses, and other health care professionals is to be encouraged, we cannot say that lay testimony alone can never be sufficient to meet the heavy burden of establishing incompetency.

*In re Estate of Wood*, 533 A.2d 772, 774 (Pa. Super. Ct. 1987).  We find such reasoning persuasive and conclude that petitioners in conservatorship proceedings in this state are not required to prove disability by presenting expert medical proof.

We now direct our attention to the testimony of the other witnesses at trial.  At trial, Ms. Davenport had her own expert, Dr. Schueler, testify concerning her mental ability.  Dr. Schueler, a geriatric psychiatrist and medical doctor, evaluated Ms. Davenport at the request of her legal counsel. He administered a "Mini-Mental Status Examination" to Ms. Davenport to evaluate her cognitive functioning, and she scored a twenty-five (25) out of a possible thirty (30) points.  He stated that her score fell within the normal scoring range for an individual eighty-five (85) years of age or older, which is a score of twenty-five (25).  Dr. Schueler opined that Ms. Davenport was not in need of a conservator. At trial, Ms. Clark also expressed her opinion that Ms. Davenport is able to care for herself and does not need a conservator.

Despite the testimony offered by these witnesses to the contrary, the testimony of the other lay witnesses clearly and convincingly demonstrates that Ms. Davenport suffers from a mental condition which renders her disabled.  *See* Tenn. Code Ann. 34-1-101(7) (2003) (defining "disabled person" as an individual suffering from a mental illness or mental incapacity).  Ms. Davenport offered the following testimony at trial:

> Q.  Do you have Internet at your house?
> A.  Yes, it works part of the time.
> Q.  Do you communicate with a lot of people through the Internet?
> A.  Part of the time.
> Q.  But it's not a real Internet; it's like in your carpet, right?
> A.  It is in the carpet on the floor.
> Q.  It is in the carpet on the floor where you connect it?
> A.  Yeah.
> Q.  And you talk to the outside world through that device?
> A.  I have tried it once or twice.

Boyd Raper ("Mr. Raper"), a licensed auctioneer and real estate broker, testified that he had business dealings with Ms. Davenport in 1999 when she asked him to auction several items for her.  He visited her just prior to the proceedings in this case, and he testified that, during their conversation, Ms. Davenport would talk "about things that really didn't make a lot of sense in a normal conversation."  Ms. Davenport told Mr. Raper about her Internet in the rug in front of her kitchen sink, and she informed him to be careful what he said in front of the Internet.

Wayne Shadden ("Mr. Shadden"), part owner of Shadden Tire Company, testified concerning another incident involving Ms. Davenport.  In 2001, Ms. Davenport drove her car at a high rate of speed across his parking lot and into another vehicle parked in front of the business.  According to Mr. Shadden, had it not been for the parked car, Ms. Davenport would have driven her vehicle into

the showroom of his business. When he got Ms. Davenport out of her vehicle after the accident, he testified that she appeared "disillusioned" and was not familiar with her surroundings. Bill Garrison ("Mr. Garrison"), Ms. Davenport's neighbor, testified that he charged Ms. Davenport $50.00 a week to mow her yard. About two months prior to the proceedings in this case, Ms. Davenport informed Mr. Garrison that she would pay him $800.00 to mow her yard, but he refused to accept the money. He testified that, over the course of the past two years, he has noticed Ms. Davenport's level of intelligence drop dramatically. Mr. Garrison recounted that Ms. Davenport informed him on one occasion that she had people living in her basement, which was not true.

Ms. Davenport's relatives also testified concerning her deteriorating mental condition. Joy Chapman ("Ms. Chapman"), Ms. Davenport's great niece and Mrs. Adair's daughter, testified that Ms. Davenport was unable to recognize her during a recent visit. She stated that, during the visit, Ms. Davenport talked to the kitchen rug and instructed Ms. Chapman to move her foot because it was on her Internet. Ms. Chapman also recounted seeing Ms. Davenport talk to the rug as if she were selling cattle over the Internet. On one occasion, Ms. Davenport called Ms. Hollingsworth to come to her house. When Ms. Hollingsworth arrived, Ms. Davenport asked her how she got past the sheriff and other men standing at the end of the driveway, which were not present. Ms. Davenport told her niece that a Methodist preacher was coming to execute Osama Bin Laden in her front yard later that morning, and she was concerned that a lot of people would be coming through her house. Ms. Davenport also told Ms. Hollingsworth that she and her brother were the governors of Tennessee. In March of 2003, Mrs. Adair and her daughter, Ms. Chapman, visited Ms. Davenport at her home. Mrs. Adair testified that Ms. Davenport informed her that she and Saddam Hussein were friends and that her other aunt had died. After leaving Ms. Davenport's residence, Mrs. Adair went to the nursing home where her aunt stayed and verified that her aunt was still alive. Don Adair, Mrs. Adair's husband, testified that Ms. Davenport referred to the rug in front of her sink as her Internet, and she once reported that several people and a radio station were in her basement.

Dr. Schueler, Ms. Davenport's own expert, testified that "[the lay witnesses] were telling the truth, and she's told me similar things." In fact, Dr. Schueler offered the following testimony at trial:

> Q.     There's been a lot of testimony about certain delusions that Doris has. Did you see any evidence of any delusions?
> A.     Yes, I did.
> Q.     Okay, like what?
> A.     On all three meetings, she has told me that a gentleman named John Ray lives in her basement. And she's pretty firm about that; it doesn't change. She's not concerned that John Ray lives in her basement; it doesn't bother her. But she believes that he lives there. She didn't invite me to meet him or anything like that. She also feels that John Ray

is somehow in the gravel business and is hauling gravel somewhere south of Chicago, because they are going to build a new Russian embassy, or actually the capital of Russia, I believe, south of Chicago — she's told me that.

She has talked about the Internet . . . .

. . . .

Q.      So you're not concerned that these delusions have negatively affected Doris, at least at the present time, it that a correct statement?

A.      Well, I would rather she didn't have the delusions. We find though that in delusional disorders in the elderly, they are incredibly difficult to treat, and actually, almost impossible to treat. Something about the older brain, when they develop delusions, they're not as responsive to medications. So trying to treat these delusions in any aggressive manner, you probably end up with more side effects than any potential benefit . . . .

. . . .

Q.      Have you been able to reach a diagnosis or a conclusion about Ms. Davenport?

A.      Yes.

Q.      What is that?

A.      She has a delusional disorder that is an Axis 1 diagnosis in psychiatry. Axis 1 diagnoses are major mental illnesses.

Despite acknowledging the existence and severity of Ms. Davenport's delusional disorder, Dr. Schueler continued to opine that she was not disabled to such an extent that a conservator needed to be appointed.

Implicit in the probate court's order ruling that Ms. Davenport is disabled is a finding regarding the credibility of the witnesses. Specifically, the trial court discounted the testimony of Dr. Schueler to the extent that he believed that Ms. Davenport was not disabled. We find no clear and convincing evidence in the record to subvert the trial court's credibility determinations. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Even though it was improper for the probate court to consider Dr. Olaechea's report, the testimony of the lay witnesses in conjunction with the testimony of Dr. Schueler clearly and convincingly established that Ms. Davenport is a "disabled person." Accordingly, we affirm the probate court's ruling on this issue.

-20-

### B.
### *Need for the Court's Assistance*

Not only did the Nieces need to prove that Ms. Davenport is disabled by clear and convincing evidence, they were also tasked with the burden of proving, by clear and convincing evidence, that she "is in need of assistance from the court before a fiduciary can be appointed." Tenn. Code Ann. § 34-1-126 (2003). Ms. Davenport argues that she is not in need of the probate court's assistance because she signed powers of attorney giving Ms. Clark the power to make decisions regarding her person and property. Ms. Davenport's argument in this regard is echoed by Ms. Clark who contends that the trial court erred in ruling that the 1996 Power of Attorney and the 2003 Powers of Attorney were void and of no effect. We will address the validity of each of these documents in turn.

### 1.
### The 1996 Power of Attorney

The probate court ruled that the 1996 Power of Attorney was not properly executed and, as a result, was void because of the following: (1) the witnesses did not sign the document under penalty of perjury, and (2) one of the witness purported to notarize her own signature. Moreover, the court found that the 1996 Power of Attorney only authorized the appointment of Noel D. Clark, Sr., and not Ms. Clark, as conservator. Finally, the probate court concluded that the Public Guardian had the power to revoke those provisions in the 1996 Power of Attorney which dealt with the appointment of a conservator. Ms. Davenport correctly notes the absence of any evidence tending to show she was mentally incapacitated at the time she executed the 1996 Power of Attorney.

The parties do not dispute that the 1996 Power of Attorney purports to be a power of attorney for health care. The legislature has provided that "[a] durable power of attorney for health care executed after July 1, 1991, is effective to authorize the attorney in fact to make health care decisions for the principal only if the power of attorney complies with this part." Tenn. Code Ann. § 34-6-202(a) (2003). Section 34-6-203 of the Tennessee Code, which governs the requirements for a properly executed power of attorney for health care, provides, in relevant part, as follows:

> (a)  An attorney in fact under a durable power of attorney for health care may not make health care decisions unless all of the following requirements are satisfied:
>> (1)  The durable power of attorney for health care specifically authorizes the attorney in the fact to make health care decisions;
>
> . . . .
>
>> (3)  The durable power of attorney for health care is executed by the following method: the durable power of attorney for health care is *signed and acknowledged before a notary public by the principal and is signed by at least two (2) witnesses who witnessed*

*the signing of the instrument by the principal, with each witness making the following declaration in substance*: "I declare under penalty of perjury under the laws of Tennessee that the person who signed this document is personally known to me to be the principal; that the principal signed this durable power of attorney in my presence; that the principal appears to be of sound mind and under no duress, fraud or undue influence; that I am not the person appointed as attorney in fact by this document; that I am not a health care provider, an employee of a health care provider, the operator of a health care institution nor an employee of an operator of a health care institution; that I am not related to the principal by blood, marriage, or adoption; that, to the best of my knowledge, I do not, at the present time, have a claim against any portion of the estate of the principal upon the principal's death; and that, to the best of my knowledge, I am not entitled to any part of the estate of the principal upon the death of the principal under a will or codicil thereto now existing, or by operation of law."

Tenn. Code Ann. § 34-6-203(a) (2001) (emphasis added). Ms. Davenport and Ms. Clark contend that, while the 1996 Power of Attorney may be inartfully drafted, the document satisfies the statute at issue.

Ms. Davenport had two individuals serve as witnesses to the execution of the 1996 Power of Attorney, one of whom was the notary. After reviewing the language used by the legislature in section 34-6-203(a) of the Tennessee Code, we conclude that the 1996 Power of Attorney must fail for reasons not relied on by the trial court or raised by the parties on appeal. The statute provides that a durable power of attorney for health care must be "signed and acknowledged before a notary public by the principal and is signed by at least two (2) witnesses who witnessed the signing of the instrument by the principal." Tenn. Code Ann. § 34-6-203(a) (2001). The statute, by its express language, requires that the document be witnessed by two individuals separate and apart from the notary public. Stated differently, it is implicit from the statutory language used by the legislature that the witnesses to the power of attorney are to serve a function separate and distinct from that of the notary public. Thus, the notary public in the instant case could not serve as one of the witnesses required by the statute. Accordingly, the notary public's attempt to serve in her capacity as notary public and as a witness causes the 1996 Power of Attorney to fail for lack of proper execution, as the document contains only the signature of one valid witness.

Ms. Davenport and Ms. Clark raise additional issues regarding the reasons put forth by the trial court for finding the 1996 Power of Attorney invalid. Having determined that the 1996 Power of Attorney is invalid for the aforementioned reason, it is not necessary that we address these additional issues. They are, therefore, pretermitted.

**2.**

-22-

## The 2003 Powers of Attorney

The probate court ruled that Ms. Davenport was disabled at the time she executed the 2003 Powers of Attorney, therefore, they were void and of no effect as well. Ms. Davenport and Ms. Clark both contend that Ms. Davenport had the requisite capacity to enter into the 2003 Powers of Attorney. We cannot agree.

Regarding the capacity required to enter into a durable power of attorney, this Court has stated as follows:

> The mental capacity required to execute a general durable power of attorney, revocable living trust and warranty deed are essentially the same and equate to the mental capacity required to enter into a contract. *See Lovett*, 1989 WL 79142, at *1 (stating that the mental capacity necessary to execute a deed and a power of attorney "must be the conscious, voluntary act of the grantor or it will be held void; likewise, the deed will be declared void if the grantor was mentally unbalanced, had no intelligent comprehension of the act being performed and was incapable of transacting at the time of the transfer") (emphasis added).
>
> The party attempting to invalidate a contract based on the theory of mental incapacity bears the burden of proof. *Knight v. Lancaster*, 988 S.W.2d 172, 177 (Tenn. Ct. App. 1998). To set aside a deed or a contract, the proof must be clear, cogent, and convincing. *Gregory v. Gregory*, 1996 Tenn. App. LEXIS 75, 1996 WL 47929, at *8 (Tenn. Ct. App. Feb. 7, 1996); *see also Myers v. Myers*, 891 S.W.2d 216, 219 (Tenn. Ct. App. 1994). When discussing the capacity necessary to contract, the *Knight* court stated:
>
>> "To avoid a contract it is insufficient to show merely that the person was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature or terms of the contract.
>>
>> . . . the mental incapacity . . . must . . . at the time [of the making of the contract constitute] such impairment of reasoning powers as to make the person incapable of acting rationally in the transaction involved, or such mental unsoundness as occasions an inability to comprehend the subject of the contract and its nature and probable consequences . . . and there

> must be an entire loss of a person's understanding as respects such transaction."
>
> 988 S.W.2d at 178 (quoting 17 C.J.S. *Contracts* § 133(1)(e)) (emphasis added); *see also Roberts v. Roberts*, 827 S.W.2d 788, 792 (Tenn. Ct. App. 1991) (adopting and quoting at length the same standard). Further, the court must only consider the mental capacity at the moment of execution of the document. *Harper v. Watkins*, 670 S.W.2d 611, 629 (Tenn. Ct. App. 1983).

*In re Armster*, No. M2000-00776-COA-R3-CV, 2001 Tenn. App. LEXIS 797, at *23–26 (Tenn. Ct. App. Oct. 25, 2001) (citations omitted).

Ms. Clark asked Joanne Stone, who has no personal relationship to Ms. Davenport, and Betty England, Ms. Davenport's caretaker, to witness the execution of the 2003 Powers of Attorney. Both testified at trial and stated that on March 7, 2003, the day Ms. Davenport signed the documents, they were present and believed that Ms. Davenport was able to understand and comprehend the documents. Both stated, however, that Ms. Davenport did not read the documents and that her attorney explained the meaning of the documents to her. Ms. Clark testified that she too was present when Ms. Davenport signed the 2003 Powers of Attorney and that Ms. Davenport fully understood the effect of the documents. In response to this testimony, Ms. Chapman and Mrs. Adair testified that they visited Ms. Davenport on the morning of March 7, 2003, just prior to the execution of the 2003 Powers of Attorney. They stated that Ms. Davenport did not mention the documents during their visit. Ms. Chapman and Mrs. Adair recounted that, on the day Ms. Davenport signed the 2003 Powers of Attorney, Ms. Davenport also stated that their aunt died, but this turned out to be untrue. Mrs. Adair also recounted that Ms. Davenport said she was related to Saddam Hussein and owned a company, both of which were not true.

Implicit in the probate court's ruling on this issue is a finding that the court found Ms. Chapman and Mrs. Adair to be credible witnesses. We find no clear and convincing evidence in the record to subvert this finding by the probate court. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Based on the testimony of Mrs. Adair and Ms. Chapman, the Nieces proved by clear and convincing evidence that Ms. Davenport did not possess the requisite capacity to enter into the 2003 Powers of Attorney. Accordingly, we affirm the trial court's ruling on this issue.

### C.
### *Selection of a Conservator*

On May 15, 2004, the probate court entered an "Order Appointing Conservator" wherein the court, relying on section 34-3-103 of the Tennessee Code, held that Ms. Davenport had no spouse and no children; due to the friction between Ms. Davenport and the Nieces, it would be inappropriate to appoint the Nieces as conservator; and Ms. Clark was not an appropriate choice for conservator due to "financial improprieties." Accordingly, the probate court determined that it was in the best

interest of Ms. Davenport to appoint the Public Guardian as conservator over her person and property.

When making a determination as to which individual or entity should be appointed to serve as a conservator over a disabled person, the courts of this state are subject to the following statutory directive:

> Subject to the court's determination of what is in the best interests of the disabled person, the court shall consider the following persons in the order listed for appointment of the conservator:
> (1) The person or persons designated in a writing signed by the alleged disabled person;
> (2) The spouse of the disabled person;
> (3) Any child of the disabled person;
> (4) Closest relative(s) of the disabled person; and
> (5) Other person(s).

Tenn. Code Ann. § 34-3-103 (2003). A trial court has broad discretion when selecting a conservator. *See In re Shipe*, No. E2003-01647-COA-R3-CV, 2004 Tenn. App. LEXIS 479, at *8 (Tenn. Ct. App. July 27, 2004); *Crumley v. Perdue*, No. 01-A-01-9704-CH-00168, 1997 Tenn. App. LEXIS 774, at *7–8 (Tenn. Ct. App. Nov. 7, 1997). Thus, we review the probate court's choice of a conservator under the abuse of discretion standard of review. *See In re Estate of Powers*, No. 02A01-9310-CH-00227, 1994 Tenn. App. LEXIS 723, at *10–11 (Tenn. Ct. App. Dec. 13, 1994).

We begin with Ms. Davenport's and Ms. Clark's argument that, even if the 1996 Power of Attorney is ineffective, the probate court should have selected Ms. Clark as conservator based upon Ms. Davenport's intent, as stated in the document, that she serve as her conservator. Section 34-6-104 of the Tennessee Code provides as follows:

> (b) A principal may nominate, by a durable power of attorney, the conservator . . . *for consideration by the court* if protective proceedings for the principal's person or estate are thereafter commenced. The court *shall make its appointment in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification*.

Tenn. Code Ann. § 34-6-104(b) (2003) (emphasis added); *see also In re Armster*, No. M2000-00776-COA-R3-CV, 2001 Tenn. App. LEXIS 797, at *15–17 (Tenn. Ct. App. Oct. 25, 2001). Section 34-3-103 of the Tennessee Code provides that the court "shall consider . . . [t]he person or persons designated in a writing signed by the alleged disabled person." Tenn. Code Ann. § 34-3-103(1) (2003). The 1996 Power of Attorney provides as follows:

> I also express my desire that should a court deem it necessary to commence legal proceedings over my estate and its management, it is my wish that NOEL D. CLARK, SR., serve as my conservator or guardian.

Ms. Davenport expressly directed that Noel D. Clark, Sr. was to serve as her conservator, not Ms. Clark. Therefore, since the individual Ms. Davenport designated as her conservator is deceased, Ms. Davenport's designation of a conservator in the 1996 Power of Attorney is of no effect. Accordingly, we find this argument to be without merit.

Next, Ms. Clark argues that the probate court erred in finding that she was not an appropriate choice for conservator due to "financial improprieties." Ms. Clark contends that the record contains no proof that she engaged in financial improprieties with Ms. Davenport's finances. We disagree. Ms. Davenport hired Ms. England as her caretaker, and Ms. England testified that she worked in this capacity seven to eight hours each day, seven days a week. Ms. England admitted that Ms. Davenport paid her for her services, but she also stated that Ms. Clark paid her an additional amount. She stated that Ms. Davenport was aware that Ms. Clark was paying her the additional money for her "extra time." Ms. Clark testified that she pays Ms. England for forty-five hours (45) of work each week, in addition to what Ms. Davenport pays her. Ms. Chapman testified that she asked Ms. England if Ms. Clark was paying her money that Ms. Davenport did not know about, to which Ms. England replied that she was. Ms. Chapman also testified that Ms. Clark subsequently admitted that she gave Ms. England money which Ms. Davenport was unaware of. Resolving this conflicting testimony is purely a question of credibility which rests in the sound discretion of the trial court. ***See Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, we affirm the probate court's finding that Ms. Clark is an inappropriate choice for conservator.

Finally, Ms. Clark argues that the Public Guardian should not be permitted to continue to serve as conservator for Ms. Davenport because others are qualified to fill this role. Ms. Clark cites to section 34-7-104 of the Tennessee Code, which provides:

> (h) While performing conservatorship duties, the district public conservator *shall continue to seek a family member, friend, other person, bank or corporation qualified and willing to serve as conservator.* If such an individual, bank or corporation is located, the district public conservator *shall submit a motion to the court* for appointment of the qualified and willing successor conservator.

Tenn. Code Ann. § 34-7-104(h) (2003) (emphasis added). We find this issue to be wholly without merit. As previously discussed, the record supports the trial court's conclusion that Ms. Clark is not an appropriate conservator. The Nieces do not contest the probate court's appointment of the Public Guardian as conservator for Ms. Davenport. Therefore, the probate court's decision that the Nieces are not appropriate conservators due to their deteriorating relationship with Ms. Davenport must stand. Further, Ms. Davenport is not married, and she has no children.

The Public Guardian is empowered "[t]o serve as conservator for disabled persons sixty (60) years of age or older who have no family members or other person, bank or corporation willing and able to serve as conservator." Tenn. Code Ann. § 34-7-104(a)(1) (2003). While Ms. Clark may be "willing" to serve as Ms. Davenport's conservator, the trial court, in exercising its discretion, has determined that she is not "able" to serve. Accordingly, the probate court did not abuse its discretion by selecting the Public Guardian as Ms. Davenport's conservator.

## D.
### *Removal of the Guardian Ad Litem*

Ms. Clark argues that the probate court erred in denying her motion to remove Mr. Fields as guardian ad litem in this case. She contends that Mr. Fields was appointed in contravention of state statute and the local rules of the probate court; the Nieces "hand-picked" Mr. Fields as guardian ad litem, therefore, he was not appointed by the probate court; and he failed to perform his duties or exceeded his authority in this case.

When a petition for the appointment of a conservator is filed, "the court shall appoint a guardian ad litem to represent the respondent." Tenn. Code Ann. § 34-1-107(a)(1) (2003). The appointment of a particular individual as guardian ad litem is within the sound discretion of the trial court. *See Gann v. Burton*, 511 S.W.2d 244, 246 (Tenn. 1974); *Campbell v. Campbell*, No. W2004-01608-COA-R3-CV, 2005 Tenn. App. LEXIS 438, at \*6–7 (Tenn. Ct. App. July 25, 2005). Our resolution of this issue would have no bearing on the outcome of this case. In any event, our review of the record reveals that the trial court did not abuse its discretion in denying Ms. Clark's motion. Accordingly, we find this issue to be without merit.

## V.
### CONCLUSION

For the aforementioned reasons, we reverse the probate court's evidentiary ruling regarding the medical report filed in this case, however, due to other evidence in the record, this error does not require a remand; affirm the probate court's ruling that Ms. Davenport is disabled; affirm the probate court's ruling that Ms. Davenport is in need of a conservator because the 1996 Power of Attorney and the 2003 Powers of Attorney are invalid; affirm the probate court's appointment of the Public Guardian as conservator; and affirm the trial court's denial of Ms. Clark's motion to remove the guardian ad litem. Accordingly, costs of this appeal are to be taxed to the Appellants, Teddie J. Clark and Doris Davenport, and their sureties, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE