Urquhart Estate.

Argued November 22, 1967. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

Theodore O. Rogers, with him Isidor Ostroff, and Rogers & O'Neill, and Ostroff & Lawler, for appellant.

Robert S. Gawthrop, Jr., with him Gawthrop and Greenwood, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 16, 1968:

On November 15, 1964, R. M. Urquhart was, on petition of his nephew G. Gordon Urquhart, II, adjudged incompetent, and the Provident Tradesmens Bank and Trust Company (now Provident National Bank) was appointed guardian of that part of his estate located in Pennsylvania. The petition was joined in by Mr. Urquhart's two brothers, one of whom, W. K. B. Urquhart, is now deceased.

Feeling himself recovered from the infirmity which had occasioned the appointment of a guardian, Mr. Urquhart, on April 7, 1966, petitioned for and obtained a citation against the Bank and his nephew G. Gordon Urquhart to show cause why the decree of incompetency should not be terminated and he restored to full charge of his affairs. A hearing followed the filing of an answer by the respondents, during which Urquhart presented evidence in support of his averred competency. The respondents countered with evidence that the mental condition of the petitioner, as adjudicated in 1964, had not changed and that, therefore, the guardianship should not terminate. In a contest of this kind, the petitioner has the burden of establishing competency by a fair preponderance of the evidence. (*Nagle Estate*, 418 Pa. 170.) The lower court held that the petitioner had not sustained that burden and dismissed the petition. Urquhart appealed.

We begin with the proposition, which is indeed elementary in the law, that no one should be deprived dominion over his own property except for monumental reasons which include harm to the owner or to the property itself or to society in general. We said in *Bryden's Estate*, 211 Pa. 633, 636: "... A man may do what he pleases with his personal estate during his

life. He may even beggar himself and his family if he chooses to commit such an act of folly. When he dies, and then only, do the rights of his heirs attach to his estate. The Act of June 19, 1901, P. L. 574, has not changed the law in this respect one iota. Before an estate can be taken from the owner and transferred to a guardian, it must be established that the respondent is so weak in mind that he is unable to take care of his property, and in consequence thereof is liable to dissipate or lose the same and to become the victim of designing persons."

There is not the slightest evidence in all this litigation to suggest that Urquhart's property may be dissipated or that he may be the victim of designing persons. Up until April, 1961, Mr. Urquhart was a man in full possession of his faculties, vigorous in the pursuit of his business affairs, and talented in the field of inventing and in dealing with real estate, all of which produced for him a small fortune on which he could live comfortably. In the month indicated, a tragic misfortune befell him in the death of his wife, his faithful and happy companion for 40 years. With her death, the cornerstone of his life seemed to be taken away, and the structure of his whole existence sagged, the doors of his communication with the outside world no longer opened easily, the windows of his spiritual world fogged, the whole dwelling of his daily routine began to show signs of deterioration, illness entered into his physical framework, and a cloud passed over the skylight of his reason. He became melancholy, wept frequently and became depressed. He was not the first one to turn to the bottle for relief from his anguish, and by no means the first one to suffer from imprudent companionship with John Barleycorn. As already indicated, his nephew and two brothers went to court to declare Urquhart incompetent to handle his

business affairs and for a guardian of his estate to be appointed.

The declared incompetency, however, was not of such gravity as to render him a pariah or unappealing to the opposite sex. Indeed, in December of 1964, he entered the holy bonds of matrimony with a widow, Mrs. Fish, who had herself had experience in caring for an ill husband. The new Mrs. Urquhart seemed to be what the doctor ordered. She became, one might say, the new cornerstone of his life. The structure of his life straightened, he began to look out at the world through transparent windows, the doors of communication opened again easily to the great outside world. His tears dried, although he manages to keep his spirit sufficiently lubricated with two brandies and three eggnogs a day. He no longer needs sleeping pills for repose which knits up the raveled sleeve of care. He is calm and happy. The contented couple live in Florida, visiting Pennsylvania in the summer season. Urquhart and his wife maintain a joint bank account. She prepares checks against the account, some of which are signed by him and most of which are signed by her. She prepares letters which he desires be written. Throughout the entire hearing, no testimony or rumor rose to suggest that Mrs. Urquhart was other than a loving, faithful wife, harboring no ulterior motives or designs on his property.

At the hearing conducted in the Orphans' Court of Chester County, Dr. H. K. van der Meer, testifying in behalf of the respondents, and generally against the petition for termination of the incompetency, nevertheless admitted: "Here I have to say Mr. Urquhart was in 1964 an emotionally unstable, somewhat helpless, lonely man. When I saw him again this time he has much more settled, quiet demeanor of an old gentleman who is well taken care of."

Dr. Louise Sandler, a psychologist who had examined Mr. Urquhart both prior to and after the original 1964 incompetency hearing, testified that in the 1965 test he had less difficulty controlling his hands, "there was less tremulousness in his reproductions, in his lines in 1965 . . . He also proceeded a bit more rapidly through the tests in 1965, being able to reproduce them at a quicker pace than he could in 1964."

Dr. Sandler stated also that she had administered to Urquhart the Thematic Apperception Test, where the patient makes up a story about people and situations he notes in pictures shown him. She stated that in 1965, "Mr. Urquhart's stories reflected a more—shall I say happy man than in 1964. They reflected a man who was interested in what was going on around him, a man who enjoyed human contact and a man who is very much aware of a stimulus, could keep to it and tell a really good story without irrelevancies, showing a good firm awareness of what was going on."

All her tests led her to conclude that "Mr. Urquhart's judgment was good" and that he "is in good contact with reality and does perceive in line with what is objectively so."

Dr. Eleanor Ross, a clinical psychologist, testified that in August, 1965, she administered the Wechsler-Bellevue test to the petitioner and gave examples of the technical questions asked on this intelligence test, such as "what is a lien?" and what is the "source of turpentine?" She stated that Urquhart scored 104 on the full schedule, based on norms which extend to age 50 to 59 only. (Norms have not been established for a person of petitioner's age.)

She also applied the Rorschach test, the Bender-Gestalt Test and the Thematic Apperception Test, using pictures different from those employed by Dr. Sandler. She testified: "My opinion on the basis of

all of these tests is that Mr. Urquhart's judgment is at least as good as that of the average person of his age, if not a good deal better in many respects. His thinking is quite realistic. He is able to pin himself down to the point in question . . . He was able to understand questions that were put to him very clearly, and this I would like to add, Mr. Urquhart's physical infirmities offer some interference here and sometimes he doesn't quite hear a question, but if you put the question to him a second time and make sure he hears the question then his answer is right. There is nothing the matter with his mind or his judgment but his hearing is poor and so is his vision." She said that she noted in him no "disorientation."

Dr. Maurice Linden testified that he had seen Urquhart possibly 30 times since the 1964 hearing, the last examination lasting three hours and taking place only several days before the court hearing, and that in his opinion the petitioner's mental condition had improved since the 1964 hearing in one particular aspect, namely, that he was more emotionally stable at this time.

The respondents called two psychiatrists, Dr. E. Lee Porter and Dr. van der Meer (already mentioned). These two experts saw the petitioner for two hours prior to the 1964 hearing and only for one hour prior to the hearing on the 1966 petition. In contrast to these examinations, the petitioner's expert witnesses had made lengthy examinations of the petitioner after he had married and settled down in Florida. The examinations conducted by the respondents' psychiatrists consisted mostly of putting questions to Urquhart. He was asked to give answers to mental arithmetic problems. Both experts stated that if the patient gave an incorrect answer to a question, this indicated intellectual impairment, but if he advanced a correct answer, this did not necessarily prove mental

competence. Dr. van der Meer specified: "The correct answer does not necessarily prove that there is no intellectual deterioration. It is the wrong answer on simple questions that proves it."

This would seem to be a "Heads I win and Tails you lose" proposition.

An illustration of the type of expert examination given to Urquhart by Dr. van der Meer is evident in the doctor's testifying that he asked Urquhart the product of 11 times 11 and, because the answer did not come forth instantly, this indicated "mental deterioration." He asked Mr. Urquhart his telephone number and Urquhart gave it to him immediately, but this proved nothing, the expert said. He asked Urquhart that if he purchased $1.60 worth of groceries and produced a $5 bill, what change would he receive, and when Urquhart answered $3.40, this did not mean anything in Urquhart's favor but when he was asked 11 times 11 and Urquhart hesitated this proved cobwebs in the cerebellum.

Dr. Porter, the other respondent's expert, testified he asked the patient the date of the examination, which happened to be May 23rd. The doctor said: "He made several attempts to identify the day of the week and the day of the month." The doctor was asked if Urquhart was successful in those attempts. The doctor replied: "I think he was uniformly unable to get it accurately unless fortuitously he hit upon it as one of the answers he offered."

In other words, if the patient gave an incorrect date, this was mental deterioration, but if he gave the correct answer, it was fortuitous! Practically every establishment has calendars hanging on the walls, every newspaper carries on every page the date. Yet, how many people, suddenly asked the date, can give it, without a moment's reflection or consulting the calendar?

It would seem from the record that both Doctors Porter and van der Meer were reluctant to accord to Urquhart a fairness in appraising his answers. For instance, note the following quotation from the cross-examination of Doctor Porter: "Q. Isn't it a fact that during the course of the examination you asked Mr. Urquhart whether he gave any presents to the new Mrs. Urquhart, if I may call her that, and he said no, he didn't? Isn't that correct? A. Yes. Q. And then **you said, you gave her a ring, didn't you?** A. Either I did or Dr. van der Meer did. Q. Didn't he say he didn't consider that was a present, that was an engagement ring? A. I think we agreed that was an appropriate answer. Q. Does that show unreality or lack of sense? A. No, I don't think that it does. Q. That is a pretty bright answer, isn't it? A. *I don't know that it is particularly bright.*" (Emphasis supplied.) The answer may not have been particularly bright, but it showed an appreciation of the nuances in words that had escaped the learned psychiatrists.

When it comes to determining the mental condition of a person, the observations of those who see and talk with the individual in his daily routine may sometimes be of more help in deciding cerebral reliability than the questioning of experts who ask what is 11 x 11. Various lay persons took the witness stand in behalf of the petitioner. George Taylor, a Florida friend, testified that whereas prior to his new marriage, Urquhart was unable to control his grief over his first wife's death, he was now calmer and "less cantankerous." Another friend, Albert Bien, described the petitioner as formerly "crying like a baby," but presently being cheerful. Another friend, a Mrs. J. E. Boak, stated there was "quite a bit of improvement"; Mrs. Alice Magee, former wife of the petitioner's deceased brother who had joined in the original 1964 petition to have him declared incompetent, testified that Urquhart had

always been competent, and that she believed her deceased husband (Urquhart's brother) had been tricked into joining in the original petition; she stated she noted a marked improvement in Urquhart's emotional condition. The petitioner's personal physician testified that in his opinion Urquhart is fully oriented and competent to manage his own affairs and is not liable to become the victim of designing persons. A trust officer of the Florida bank where Urquhart does business testified that he found him rational and competent.

Mrs. Urquhart testified that the petitioner was thoroughly conversant with his business affairs and was capable of managing his affairs. When asked to describe a typical day for them, she stated: "Well, we are fairly quiet. I get up earlier than Morry does. He has his breakfast very late. We may take a ride or we may go to dinner or a cocktail party or have some people in and we spend several days by ourselves. We drive to Palm Beach. We saw *My Fair Lady* and *Sound of Music* which we enjoyed very much."

She testified that the $1500 check which comes each month from the guardian bank is endorsed by Urquhart. She was asked whether this amount seemed "to reasonably meet" their needs, and she replied "Oh, very much. We are not extravagant."

How did Urquhart fare when he testified? The Superior Court properly said in *Ryman's Case,* 139 Pa. Superior Ct. 218: "One's mental capacity is best determined by his spoken words, his acts and conduct." One cannot read the testimony of Mr. Urquhart as it appears in the record without concluding that he is quite familiar with the orbiting of his own world on its economic axis. He told about his real estate, its acreage, the value he placed on it, he related how the Highway Department had condemned a portion of it for a highway, the offer which had been made to him

and that he was not willing to accept the offer, he described mortgages that he owned and things that needed to be done on his property, such as painting of houses.

Under direct examination he acquitted himself with credit. Some answers would suggest that his brain swings on hinges which show but little sign of rust or corrosion: "Q. Do you feel you are able to do it [manage his property]? A. I am capable to do it. Q. The property you now have, all of this property, where did you get it? A. Well, I saved it, bought it. Q. These are the results of your efforts? A. My efforts and nobody else's efforts."

What was said by Chief Justice MAXEY in *Denner v. Beyer,* 352 Pa. 386, can be said here: "It is a serious thing to deprive any person of the control of their own property or of their right to dispose of it by will. This right will be judicially taken away from a person only after preponderating proof of his lack of mental capacity to manage his own business affairs. There is no such proof in this record."

We are satisfied that R. M. Urquhart more than met the burden of proving he is now competent[1] to manage his own affairs, and that it was an abuse of the lower court's discretion not to accord the plaintiff's evidence the weight it merited, and to accept instead the testimony of two experts who conducted a one-hour examination of the petitioner prior to the hearing. Those experts based their opinion for the most part on Urquhart's arteriosclerotic condition and its effect on the brain's functions, but this, in and of itself, was not proof that the petitioner is unable to take care of his property or that he may be victimized. Even the respondents' own witnesses did not describe the petitioner as a paranoid, as the court had done in 1964.

---

[1] *Earnshaw Appeal,* 187 Pa. Superior Ct. 124.

At the hearing, the petitioner's attorney offered to have Mr. Urquhart examined by a psychiatrist chosen by the court and to bear all expenses in connection with such an examination. Neither the respondents nor the court would accept the offer.

Decree reversed, appellees to bear costs.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

An examination of the instant record convinces me that the court below correctly concluded that on the 23 of May, 1966, R. M. Urquhart was still mentally incompetent and had not regained the status of a mentally competent person.

Mr. Justice COHEN and Mr. Justice O'BRIEN join in this dissenting opinion.