J-A25006-25                    2026 PA Super 30

| | | |
|---|---|---|
| IN RE: M.E., AN INCAPACITATED PERSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.E. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 881 EDA 2025 |

Appeal from the Order Entered March 18, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
2020-OC-1419

BEFORE:     LAZARUS, P.J., BOWES, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY LAZARUS, P.J.:                    **FILED FEBRUARY 19, 2026**

M.E. appeals from the order, entered in the Court of Common Pleas of Lehigh County, Orphans' Court Division, denying his request to terminate the plenary guardianship of his estate.  After careful review, we reverse.

The trial court summarized the procedural history and facts of this case as follows:

> On January 21, 2021, the Orphans' Court adjudicated [M.E.] incapacitated and appointed Attorney Steven A. Litz as plenary guardian of the estate.  Following a review hearing on March 19, 2021, the Orphans' Court reaffirmed the finding of incapacity, continued the appointment of Attorney Litz, but found [M.E.] did not require an appointed guardian of the person.  Consistent with his duties as plenary guardian of the estate, Attorney Litz filed annual reports in 2022, 2023, and 2024.  Thereafter, following receipt of [M.E.'s] correspondence dated July 8, 2024, in which [M.E.] requested the discharge of Attorney Litz, the Orphans' Court treated [M.E.]'s pro se filing as a hearing request on whether [M.E.] still required an appointed plenary guardian of the estate.  By [o]rder of November 12, 2024, the Orphans' Court

_____

[*] Retired Senior Judge assigned to the Superior Court.

appointed counsel to assist [M.E.] in filing a review petition regarding termination of the guardianship, and scheduled a hearing to address whether the January 21, 2021 [o]rder required modification or termination. The Orphans' Court held a hearing February 18, 2025[, which was] attended by [M.E.], his court-appointed counsel, and by Attorney Litz as Guardian of the Estate. Following the hearing and upon consideration of all evidence presented, the Orphans' Court entered the March 18, 2025 [o]rder denying [M.E.]'s review petition, along with a [m]emorandum [d]ecision setting forth the reasons and rationale for the [o]rder.

Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 1-2 (italics omitted).

By way of background, M.E. has a history of bipolar disorder and depression and is currently taking medications for both. *See* N.T. Review Hearing, 2/18/25, at 10. While M.E. was at one point diagnosed with schizophrenia and dementia, he is not currently displaying signs of either of those diagnoses. *See id.* at 16-18. M.E. presently resides in a skilled nursing facility. *Id.* at 29. In 2024, M.E. circumvented the guardian of his estate by becoming his own representative payee for his Social Security benefits based upon a letter he obtained from his physician indicating that M.E. had regained capacity. *Id.* at 24; *see also* Brief of Appellant, at 29-30. During this time, M.E. obtained benefits he was not entitled to and failed to pay bills from his care facility. *See* N.T. Review Hearing 2/18/25, at 24, 34-36.

At the February 18, 2025 review hearing, M.E. presented the telephonic testimony of two medical experts, Luke Ciaccio, Ph.D., and Bruce Thorkildsen, M.D., both of whom opined that M.E. had regained his capacity. Doctor Ciaccio, who has a Ph.D. in clinical psychology and has practiced for 36 years, has been treating M.E. for the "better part of the year" and has seen him

several dozen times. *See id.* at 9. Doctor Ciaccio testified that he performed a clinical interview, a basic cognitive assessment called the Montreal Cognitive Assessment ("MoCA"),[1] and a neuropsychological assessment battery and assessment of capacity. *Id.* Doctor Ciaccio testified that M.E. performed "fairly well" on the examinations and scored 24 out of 30 possible points on the MoCA. *Id.* at 9, 11. Doctor Ciaccio stated that M.E.

> seems to be aware of . . . what his income is, what his expenses are going to be post-discharge when he [] live[s] in an apartment. [H]e is aware also of additional resources he would have to assist him, like food stamps, Meals on Wheels[,] and LIHEAP, which is assistance with having some subsidies for a heating expense.

*Id.* at 12. Doctor Ciaccio opined that M.E.'s ability to communicate decisions, give informed consent, and manage his finances and activities of daily living are unimpaired, although he is likely to need "clarification to maximize his comprehension," as well as reminders as to his medical diagnoses and medications. *Id.* at 13-15. However, Dr. Ciaccio believes that M.E. "would be receptive to any recommendations made by any practitioners . . . and would do follow-up care." *Id.* at 15. Doctor Ciaccio concluded, to a reasonable degree of psychological certainty, that M.E. has regained his capacity. *Id.* at 12, 15.

On cross-examination, Dr. Ciaccio testified that he did not administer the Saint Louis University Mental Status Exam ("SLUMS") for the same reason

---

[1] Doctor Ciaccio stated that he administered the MoCA rather than the mini mental status exam because "the mini mental status [exam] is less rigorous with regard to looking at those specific areas of cognition." *Id.* at 16.

he did not administer the mini mental exam—because it is not as rigorous as the MoCA. *Id.* at 15-16. When asked whether he believed M.E.'s previous diagnosis of schizophrenia was accurate, Dr. Ciaccio responded as follows:

> Well, that's what's put down there [in M.E.'s records]. I have some questions whether that is accurate or not. One of the problems I've had with people's records coming over with diagnoses [is] that some of the [diagnoses] are given casually. So[,] I don't know for sure that he has schizophrenia. I have not been privy to all of the previous psychiatric records. **I can just say that I do not and have not observed any symptoms of psychosis during my time with him**.
>
> That's not to say he's never had symptoms in the past, but it looks like at this point, based on his presentation, he is not demonstrating any . . . hallucinations, whether it's visual or auditory, or any other symptoms of psychosis.

*Id.* at 16-17 (emphasis added). Doctor Ciaccio similarly questioned M.E.'s previous diagnosis of dementia, stating that he has "not seen . . . behavior in [M.E.] that he's really presented that way with those symptoms." *Id.* at 18. Doctor Ciaccio indicated that M.E.'s current symptoms of depression and anxiety "appear to be minimal" and that M.E.'s "medications are doing what they're designed to do and controlling those." *Id.* at 18-19. Regarding M.E.'s 2024 change of his representative payee status with the Social Security Administration and subsequent failure to pay the required funds to his skilled-care facility, the following exchange occurred:

> [ATTORNEY LITZ]: Okay. Doctor, would you call a person who keeps—who's on Medicaid, who keeps his income instead of paying for the facility[ that] provides him with his lodging, food, medication, [and] healthcare unimpaired?
>
> A: I would call that poor judgment. So[,] let me just clarify a couple of things. Number one, the idea that a person has capacity

is not a prediction that he would utilize those abilities to make the decisions.

. . .

So[,] what I'm trying to say, sir, is I'm not clairvoyant. I'm not making the prediction. I'm just saying what somebody's ability is, just like any person you might look at and think, oh, that person makes terrible decisions all the time, right? Well, the person who makes terrible decisions may be making those decisions knowing full well that they're not the best or that they may have negative ramifications. That doesn't mean that that person doesn't know better. Let's put it that way.

*Id.* at 23-24.

Doctor Thorkildsen—a licensed physician, board certified in internal medicine, and a fellow of the American College of Physicians—testified that he has been treating M.E. for approximately five years, predating his adjudication of incapacity. *Id.* at 29. Doctor Thorkildsen testified that when he recently evaluated M.E., he was "fully cognizant at the time[,] he was able to tell me the amounts of income that he expected on a monthly basis from both his pension and his Social Security and how he was going to use the fund." *Id.* at 29. Doctor Thorkildsen said that M.E. "demonstrate[d] to [him] that [] he knew what was going on financially." *Id.* at 30. Doctor Thorkildsen further opined:

I believe [M.E. is] of a capacity to manage his affairs in a reasonable manner. **I [] treated him when he was acutely ill, and at that time, he did not have any capacity to manage his affairs. So[,] in comparison to how he is now, I think he is certainly very capable**.

*Id.* at 31 (emphasis added). Doctor Thorkildsen opined that M.E. is "not in the same mental condition that he was" at the time when the guardian of the estate was initially appointed and that he "absolutely" is not incapacitated and

has the capacity to manage his financial affairs. *Id.* at 30, 35. When M.E.'s counsel asked Dr. Thorkildsen whether the fact that M.E. "has made poor financial decisions" would impact his opinion as to M.E.'s ability to understand and make his own decisions, Dr. Thorkildsen responded that it would not. *Id.* at 31.

On cross-examination, Dr. Thorkildsen testified that he has treated M.E. both prior to and since his hospitalization in 2020. *Id.* at 32. When asked if poor financial decisions had been responsible for M.E. being homeless at one point, Dr. Thorkildsen replied: "Probably yes, plus the fact that he was undergoing an acute bipolar episode with depression." *Id.* at 33. Doctor Thorkildsen testified that M.E. is "not in the same mental condition that he was at the time" a guardian was appointed. *Id.* at 35.

The following exchange occurred on redirect examination:

[M.E.'s COUNSEL]: Dr. Thorkildsen, just to address the issue at hand again, if someone doesn't pay their mortgage, does that mean they lack capacity?

A: No. Their choice.

Q: If someone doesn't pay their rent, does that mean they lack capacity?

A: No.

Q: And so[,] having capacity, would you say, means the right to make good decisions and bad decisions?

A: Absolutely.

Q: And do you believe that [M.E.] has the capacity to make both good decisions and bad decisions regarding his finances?

A: Yes.

*Id.* at 36-37.

M.E. testified that, since he has resided in the skilled care facility, he has participated in occupational and speech therapy. *Id.* at 38. He regularly interacts with his doctors, listens to their opinions, and occasionally questions those opinions. *Id.* at 38-39. M.E. testified that he is able to leave the facility at will. *Id.* at 39. He has a friend who will pick him up or, in the alternative, he receives transportation from the LANta Van, which requires a deposit of $25.00 plus $4.00 per trip.[2] *Id.* at 39, 41. M.E. testified that, if he left his skilled nursing facility, an independent living company called Roads to Freedom would assist him in obtaining a placement in a rent-controlled, subsidized program through HUD, for which he would pay 30% of his income. *Id.* at 40. M.E. testified that his current monthly income is approximately $1,200.00, including Social Security and his Canadian pension. *Id.* at 41. M.E. stated he understood that he would be responsible for paying for utilities such as electricity and heat, as well as his cell phone. *Id.* M.E. testified that he would be able to maintain an apartment, cook for himself, and do his own laundry. *Id.* at 42. He is also aware that he can apply for assistance through Northampton County and utilize the services of Meals on Wheels. *Id.*

M.E. testified that Social Security is currently taking $10.00 per month from his benefits in reimbursement for the previous overpayment. *Id.* He

---

[2] LANtaVan is a door-to-door, shared ride or paratransit service, available to riders in Lehigh and Northampton Counties who are registered and certified as eligible for sponsorship under various transportation funding programs. *See* https://lantabus.com/lantavan/ (last visited Dec. 4, 2025).

stated that he "ha[s]n't touched" his Canadian pension and currently has $800.00 on a GO2bank debit card, which he uses to purchase food and beverages. *Id.* at 43-44. Finally, M.E. testified that he understood that, if he left the skilled care facility, he would need to continue taking his medication, and that he could arrange for medical and psychiatric care through Medicaid and Medicare. *Id.* at 44.

Attorney Litz, who advocated for maintaining M.E.'s guardianship, did not present any testimony—expert or otherwise—to rebut the testimony of M.E.'s two experts. The only evidence Attorney Litz presented consisted of statements and notices relating to the overpayment of benefits from Social Security, as well as documentation relating to M.E.'s consequent arrearages to his care home. *See* Guardian's Exhibits 1-6.

Notwithstanding the testimony of M.E.'s experts, the court concluded— largely based on its belief that M.E. is unable to handle his finances in light of the 2024 Social Security incident—that "the hearing evidence clearly established that [M.E.] is unable to handle his finances, no less restrictive alternative exists under the circumstances and[,] thus[,] he requires the continued appointment of a plenary guardian of the estate." Trial Court Opinion, 3/18/25, at 5. Accordingly, the Orphans' Court denied M.E.'s request to terminate his guardianship. M.E. filed a timely notice of appeal. Both M.E. and the trial court have complied with Pa.R.A.P. 1925. M.E. raises four issues for our review:

1. Did the Orphans' Court abuse its discretion by denying [M.E.]'s petition for review seeking termination of [his] guardianship?

2. Did the Orphans' Court abuse its discretion by misapplying the statutory definition of "incapacity," as set forth in 20 Pa.C.S.[A.] § 5501, to [M.E.]?

3. Did the Orphans' Court abuse its discretion and commit an error of law by disregarding the uncontradicted expert testimony and evidence presented by [M.E.]?

4. Did the Orphans' Court abuse its discretion by misapplying the appropriate burden of proof to both [M.E.] and the proponent of the continued guardianship?

Appellant's Brief, at 5 (unnecessary capitalization omitted).

Our scope and standard of review of a decision of the Orphans' Court is

as follows:

The findings of a judge of the [O]rphans' [C]ourt division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the [O]rphans' [C]ourt's findings, our task is to ensure that the record is free from legal error and to determine if the [O]rphans' [C]ourt's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

*In re Est. of A.J.M.*, 308 A.3d 844, 852 (Pa. Super. 2024), quoting *In re*

*Estate of Bechtel*, 92 A.3d 833, 837 (Pa. Super. 2014).

We begin by setting forth the purpose of Chapter 55 of the Probate,

Estates, and Fiduciaries Code ("PEF Code"), relating to incapacitated persons:

Recognizing that every individual has unique needs and differing abilities, it is the purpose of this chapter to promote the general welfare of all citizens by establishing a system **[that] permits**

**incapacitated persons to participate as fully as possible in all decisions [that] affect them**, which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources[,] and developing or regaining their abilities to the maximum extent possible and **[that] accomplishes these objectives through the use of the least restrictive alternative**; and recognizing further that when guardianship services are necessary, it is important to facilitate the finding of suitable individuals or entities willing to serve as guardians.

20 Pa.C.S.A. § 5502 (emphasis added).

This Court has previously warned of the need for "scrupulous adherence to the principles of protecting the incapacitated person by the least restrictive means possible." ***In re Estate of Rosengarten***, 871 A.2d 1249, 1255 (Pa. Super. 2005).

The dangers of the incompetency statute have been recognized since its inception. ***In re Bryden's Estate***, [] 61 A. 250, 250 ([Pa.] 1905) (statute allowing for declaration of incompetency "is a dangerous statute" and is "to be administered by the courts with the utmost caution and conservatism."). It is basic to our jurisprudence that **a person's property is theirs to dispose of as they wish, even if it results in poverty**. ***Id.*** As the Court stated in ***Bryden***, "[t]he basic principle involved, as laid down in ***Lines v. Lines***, [] 21 A. 809 [(Pa. 1891)], [is] that a man may do what he pleases with his personal estate during his life. **He may even beggar himself and his family if he chooses to commit such an act of folly**." ***Id.*** [I]n ***In re Hyman***, 811 A.2d 605, 608 (Pa. Super. 2002) (quoting ***Estate of Haertsch***, [] 609 A.2d 1384, 1386 ([Pa. Super.] 1992)), we noted that the incompetency statute "places a great power in the court. The court has the power to place total control of a person's affairs in the hands of another. This great power creates the opportunity for great abuse." The above[-]cited and other provisions of Chapter 55 are tailored to ensure that the incapacitated person's wishes are honored to the maximum extent possible.

***Id.*** at 1254-55 (emphasis added).

- 10 -

Section 5512.2 of the PEF Code governs review hearings in incapacity matters and provides, in relevant part, as follows:

> (a.1) Petition for review.--At any time following the issuance of the order establishing guardianship, any interested person may file a petition with the court to terminate or modify the guardianship. The court shall promptly schedule a hearing or hold a review hearing at any time it shall direct. The hearing shall be held in the presence of the incapacitated person and the incapacitated person's attorney, and the court shall adhere to the procedures and standards as outlined in section 5512.1(a). If, following the presentation of evidence and testimony from all parties, the court finds that guardianship continues to be necessary and that no less restrictive alternatives exist, the court may order that the guardianship continue. If the court finds that guardianship is no longer necessary or a less restrictive alternative exists, the court shall discharge the guardianship.
>
> (b) Burden of proof and rights.--The incapacitated person shall have all of the rights enumerated in this chapter. Except when the hearing is held to appoint a successor guardian, **the burden of proof, by clear and convincing evidence, shall be on the party advocating continuation of guardianship** or expansion of areas of incapacity.[3]

_____

[3] Section 5512.2 places no burden on the party seeking termination of the guardianship. Previous case law, however, states that an incapacitated person bears the burden of proving, by a fair preponderance of the evidence, that he has regained capacity. *See In re Porter's Estate*, 345 A.2d 171 (Pa. 1975); *Urquhart Estate*, 245 A.2d 141 (Pa. 1968). These cases were decided under previous statutory schemes. Former section 323 of the Incompetents' Estates Act of 1951 provided that: "The court, upon petition and after such notice as it shall direct, may find, **after a hearing at which good cause is shown**, that a person previously adjudged incompetent has become competent." 50 P.S. 3323 (emphasis added). Our Supreme Court held that "good cause" was satisfied by a fair preponderance of the evidence. *See Porter*, 345 A.2d at 174. In 1974, the legislature re-enacted section 3323, verbatim, at 20 Pa.C.S.A. 5517. Finally, in 1992, the current statutory scheme was enacted at section 5512.2, which omitted the "good cause" element and, instead, placed a burden of "clear and convincing evidence" on the party seeking to

*(Footnote Continued Next Page)*

20 Pa.C.S.A. § 5512.2(a.1), (b) (emphasis added). "'Clear and convincing evidence' is the highest burden in our civil law and requires that the fact-finder be able to 'come to clear conviction, without hesitancy, of the truth of the precise fact in issue.'" ***In re Estate of Heske***, 647 A.2d 243, 244 (Pa. Super. 1994), quoting ***Lessner v. Rubinson***, 592 A.2d 678, 681 (Pa. 1991).

Section 5512.2(a) sets forth factors to be considered by the court in determining whether a guardianship continues to be necessary:

> (1) whether the incapacity could be adequately managed by medication, rehabilitation[,] or other means;
>
> (2) whether the potential exists for the incapacitated person to regain physical or cognitive capacity;
>
> (3) the opinion of a medical professional or other qualified expert who has personally examined the incapacitated person;
>
> (4) the circumstances of the incapacitated person's daily living, including, but not limited to, support from others; and
>
> (5) any other factor indicating that the incapacitated person's condition could improve at a future time.

20 Pa.C.S.A. § 5512.2(a).

_____

maintain the guardianship. ***See*** 20 Pa.C.S.A. § 5512.2(b). In ***Rosengarten***, ***supra***, decided thirteen years after the "good cause" element was excised from the statute, this Court, relying on ***Porter***, continued to place a burden of proof on the person seeking an adjudication of capacity by a fair preponderance of the evidence. ***Porter*** was, of course, decided under the prior "good cause" statutory scheme. Thus, it appears that the ***Rosengarten*** Court improperly recited the formerly applicable burden of proof. However, due to the procedural posture of that case, the Court's recitation of the burden of proof was merely dicta, as it was not necessary to the resolution of the case.

M.E. argues that, here, the trial court "based its opinion on false premises and capriciously disregarded competent evidence by [M.E.'s] experts." Brief of Appellant, at 30. M.E. cites numerous factual inaccuracies in the Orphans' Court's opinion—for example, in its Memorandum Decision dated March 18, 2025, the court stated that Dr. Ciaccio "saw [M.E.] on two occasions[.]" Memorandum Decision, 3/18/25, at 2. However, at the review hearing, Dr. Ciaccio testified that he had "probably seen [M.E.] several dozen times." N.T. Review Hearing, 2/18/25, at 9. M.E. argues that the court further mischaracterized Dr. Ciaccio's testimony regarding M.E.'s use of the drug Zyprexa as well as the diagnoses contained in the expert report underlying M.E.'s adjudication of incapacity in 2021. *See* Brief of Appellant, at 31. M.E. argues that the court failed to discuss Dr. Thorkildsen's in-court testimony at all, only referring "dismissively" to his letter, which the court described as "a short, conclusory document which reflects a well-meaning, but factually unsupported[,] opinion that [M.E.] is capable of managing his finances at this time." *Id.* at 35, quoting Memorandum Decision, 3/18/25, at 3.

M.E. further argues that the court capriciously disregarded the uncontradicted conclusions of both of M.E.'s experts and, instead, "focused almost entirely on [M.E.'s] use (or misuse) of funds[.]" *Id.* at 35. M.E. argues that the court "accepted Dr. Ciaccio's observations [regarding certain deficits in M.E.'s executive functioning], but rejected his conclusion [that M.E. has the capacity to manage his finances], thereby supplanting them with his own." *Id.* at 37. M.E. takes issue with the court's focus on his past financial

mismanagement, noting that "[t]he inability to manage finances is not a symptom of incapacity—it is the result." *Id.* at 38. M.E. quotes our Supreme Court's decision in *Porter*, *supra*, in which the Court held that

> a guardianship may not be created, or continued, merely because the person lacks the ability or experience needed to manage large sums of money. A guardianship is proper only if such inability to manage one's property results from infirmities of old age, mental illness, mental deficiency or retardation, drug addiction[,] or inebriety.

Brief of Appellant, at 38-39, quoting *Porter*, 345 A.2d at 173. M.E. argues that the Orphans' Court failed to correctly "apply the law by using proof of financial irresponsibility as proof of incapacity, without any evidence of the incapacity itself." *Id.* at 41. M.E. posits that

> [t]he essential question for [the Orphans' Court], for which the proponent [of maintaining the guardianship] carries a continuing burden of proof by clear and convincing evidence, is not whether a person can manage [his] finances; it is whether [he is] so impaired that, as a result of the impairment, [he] cannot manage [his] finances.

*Id.* at 45.

Finally, M.E. asserts that Attorney Litz, as the party advocating for continuation of the guardianship, failed to sustain his burden to prove, by clear and convincing evidence, that M.E. remains in need of a guardian. According to M.E., Attorney Litz

> provided no evidence whatsoever regarding capacity, and only regarding [M.E.'s] alleged misuse of finances and poor financial decision-making. [Attorney Litz] summarized his argument in one simple phrase: "[M.E.] is incapacitated because he doesn't use his money correctly." [N.T. Review Hearing, 2/18/25, at 50.] The

- 14 -

> Orphans' Court relied entirely on evidence of [M.E.'s] poor financial decisions as evidence of his continued capacity.

Brief of Appellant, at 45-46.

After review of the record in this matter, and mindful of our deferential standard of review, **A.J.M.**, **supra**, we are constrained to agree with M.E. that the Orphans' Court abused its discretion and erred as a matter of law in denying M.E.'s request to terminate his guardianship by capriciously disregarding the uncontradicted testimony of two well-qualified experts and ignoring the mandates of statutory law and long-standing precedent.

As the proponent of continuing the guardianship, Attorney Litz bore the burden to prove, by clear and convincing evidence, that M.E. was still in need of a guardian. **See** 20 Pa.C.S.A. § 5512.2(b). Despite that fact, Attorney Litz presented no evidence in support of his position that M.E. continues to be in need of guardianship services, other than a few documents relating to the representative payee incident. In contrast, M.E. presented the testimony of two experts—one his treating psychologist and the other his treating physician—both of whom opined that M.E. has regained capacity and is capable of managing his finances. The Orphans' Court, based in part on the false premises highlighted by M.E. in his brief, entirely disregarded M.E.'s expert testimony, summarily concluding it was "effectively controverted on cross-examination." Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 5.

While a trial court is not required to defer to the opinions of expert witnesses, "[i]t is an abuse of discretion [] for a trial court to dismiss 'as unpersuasive, and to totally discount, uncontradicted expert testimony.'"

***M.A.T. v. G.S.T.***, 989 A.2d 11, 19, quoting ***Murphey v. Hatala***, 504 A.2d 917, 922 (Pa. Super. 1986). "[I]f the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record." ***M.A.T.***, 989 A.2d at 20, citing ***Nomland v. Nomland***, 813 A.2d 850, 854 (Pa. Super. 2002). Here, the Orphans' Court opined that "Dr. Ciaccio ignored critical examples of [M.E.'s] behavior that demonstrated his inability to manage his finances which were contrary to Dr. Ciaccio's conclusions that [M.E.] was just making poor choices." ***Id.*** at 6. However, the court's laser-like focus on evidence of M.E.'s past financial mismanagement ignores well-settled precedent that "a guardianship may not be created, or continued, merely because the person lacks the ability or experience needed to manage large sums of money." ***Porter***, 345 A.2d at 173. An individual's financial irresponsibility simply may not be the sole basis for a determination of continuing incapacity; rather, there must be proof that the financial mismanagement is **the result of** incapacity. ***See*** 20 Pa.C.S.A. § 5501 (defining "incapacitated person," in relevant part, as adult whose "ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources"). In this case, the court's decision was based primarily on its belief that M.E. is unable to manage his finances. ***See*** Memorandum Decision, 3/18/25, at 5 (concluding that "[t]he hearing evidence clearly established that [M.E.] is unable to handle his finances, no less restrictive alternative exists under the circumstances, and

thus he requires the continued appointment of a plenary guardian of his estate"); Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 8-9 ("[M.E.] has demonstrated his incapacity to manage his finances while living in a structured setting where many of the day-to-day activities are managed for him, and therefore, it is highly unlikely [he] will suddenly obtain the capacity to manage his finances in a markedly different and challenging environment."); *id.* at 10-11 ("[M.E.] for a six-month period demonstrated that he was unable to manage his finances by failing to pay the nursing home facility, retaining improper social security payments, mismanaging SNAP overpayments, and as a result, [M.E.] now owes tens of thousands of dollars in back payments to various governmental entities.").

In rejecting Dr. Ciaccio's testimony, the Orphans' Court asserted that Dr. Ciaccio was "admittedly not privy to all of [M.E.'s] psychiatric information" and "lacked the information to fully understand [M.E.'s] symptoms of diagnosed dementia." Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 6, citing N.T. Hearing, 2/18/25, at 17:4 (Doctor Ciaccio stating "I have not been privy to all of the **previous** psychiatric records.") and 20:7-10 (Doctor Ciaccio testifying he "lack[s] information to understand exactly the symptoms that **were** considered to be consistent with dementia **at the time** [Dr. Sholevar] gave that diagnosis") (emphasis added). However, the court ignores the fact that this testimony relates to Dr. Ciaccio's lack of complete familiarity with M.E.'s **past** conditions. The purpose of a review hearing is to ascertain whether M.E. is **currently** impaired to such an extent that a guardianship continues to be

- 17 -

necessary. As M.E.'s treating psychologist, Dr. Ciaccio is certainly in the best position to opine as to M.E.'s **current** mental status.[4]

The Orphans' Court's rejection of Dr. Thorkildsen's opinions similarly fails to withstand close scrutiny. The court focuses its discussion of Dr. Thorkildsen's testimony solely on the financial issue, concluding that "credible evidence . . . established that [M.E.] was unable to manage his finances by failing to pay for his care . . . and failing to repay an overpayment from [] Social Security." Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 7. The court cites to no evidence of record—other than M.E.'s past financial mismanagement—to support its rejection of Dr. Thorkildsen's opinion. Such evidence is insufficient to justify the continuation of a guardianship. *See Porter*, *supra*. Indeed, Dr. Thorkildsen has unique insight into M.E.'s progress since his 2021 adjudication of incapacity, as he has been treating M.E. for five years. Doctor Thorkildsen, having "treated [M.E.] when he was acutely ill," agreed that, "at

_____

[4] In its Rule 1925(a) opinion, the Orphans' Court curiously faults M.E. for not submitting "any evidence from his treating psychiatrist(s) to demonstrate that the long[-]standing diagnosis of dementia or bi-polar disorder had improved to any significant degree from 2021." Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 8. We first note that M.E. had no burden to prove anything—the burden was on Attorney Litz as the party advocating for continuation of the guardianship. *See* 20 Pa.C.S.A. § 5512.2(b). Moreover, there is nothing in section 5512.2 requiring the testimony of a psychiatrist. Rather, section 5512(a), incorporated by reference into section 5512.2(a.1) (setting forth procedures for review hearing), provides that the court may consider "the opinion of **a medical professional or other qualified expert who has personally examined the incapacitated person**." *Id.* at § 5512.2(a)(3). Doctors Ciaccio and Thorkildsen both fit that description and each of them testified that M.E. is now competent.

that time, he did not have the capacity to manage his affairs." N.T. Review Hearing, 2/18/25, at 31. However, Dr. Thorkildsen testified that M.E.'s condition has improved since that time, such that he is now "very capable" and is "of a capacity to manage his affairs in a reasonable manner." *Id.*

The Orphans' Court justifies its rejection of M.E.'s experts' testimony by baldly asserting that "those opinions were effectively controverted on cross-examination." Pa.R.A.P. 1925(a) Opinion, 5/30/25, at 5. However, the court fails to specify how Attorney Litz "effectively controverted" the experts' testimony.[5] To the extent that the court provided any explanation at all, its focus remained on M.E.'s past financial mismanagement, not on whether M.E. actually remains incapacitated. *See id.* at 5-8 (discussing rejection of expert opinions).

This case bears close factual similarities to *Porter*.[6] There, the appellant was declared incompetent[7] in 1926 and a guardian was appointed

_____

[5] We note that, in its memorandum decision dated March 18, 2025, the Orphans' Court curiously failed to in any way address the testimony given by M.E.'s experts at the review hearing, referencing only their written reports. *See* Memorandum Decision, 5/30/25, at 2-3 (discussing opinions rendered in written reports).

[6] We acknowledge that *Porter* was decided under a prior statutory scheme, *see* discussion *supra* n.4, in which the person seeking a declaration of capacity bore the burden of proof by a fair preponderance of the evidence. Nevertheless, we find germane the *Porter* Court's rejection of the Orphans' Court's focus on financial mismanagement in the face of uncontroverted expert testimony that the appellant had regained his capacity.

[7] Prior to 1992, the PEF Code referred to individuals needing a guardian due to an inability to manage their finances or health as "incompetents."

to manage his estate. In 1974, appellant filed a petition for adjudication of competency. At a hearing on the petition, appellant presented testimony from a psychiatrist, a psychologist, and a physician, all of whom testified that he was competent. Appellees—appellant's niece and nephew—presented no witnesses of their own. Nevertheless, the Orphans' Court denied appellant's petition.

On appeal, this Court emphasized that a guardianship may not be created or continued solely on the basis that the person lacks the ability to manage his money. Rather, "[a] guardianship is proper only if such inability to manage one's property **results from** 'infirmities of old age, mental illness, mental deficiency or retardation, drug addiction[,] or inebriety.'" ***Id.***, quoting ***Urquhart's Estate***, 245 A.2d 141, 142 (Pa. 1968).

As in the instant matter, the ***Porter*** Court observed that the Orphans' Court's denial of appellant's petition rested primarily on its conclusion that the appellant could not prudently manage his finances. The Court concluded that, "regardless of how well-intentioned or [] accurate that conclusion is, **it is not a legally justifiable basis for continuing to deprive appellant of the full control of his property**." ***Id.*** at 174 (emphasis added). The Court noted that "three well-qualified experts testified that appellant is competent, and their testimony was uncontradicted." ***Id.*** While acknowledging that the appellant's burden is not met merely because his expert testimony is uncontradicted, the Court noted that "the trial court's discretion is certainly not unlimited." ***Id.*** Having concluded that the trial court's stated concerns

were insufficient in the face of the uncontradicted expert testimony, the Court reversed.

Likewise, here, Attorney Litz failed to adduce any evidence to contradict the well-qualified testimony of M.E.'s experts that he is no longer incapacitated. In rejecting the testimony of Drs. Ciaccio and Thorkildsen without any record basis other than M.E.'s previous financial mismanagement, the Orphans' Court both exceeded the bounds of its discretion, ***M.A.T.***, ***supra***, and committed an error of law by disregarding well-settled precedent holding that a guardianship may not be continued merely because a person might lack the ability to manage his finances. ***See Porter***, ***supra***. ***See also Rosengarten***, 871 A.2d at 1254 ("[A] man may do what he pleases with his personal estate during his life. He may even beggar himself and his family if he chooses to commit such an act of folly."); ***Urquhart***, 245 A.2d at 146, quoting ***Denner v. Beyer***, 42 A.2d 747, 752 (Pa. 1945) ("It is a serious thing to deprive any person of the control of [his] own property" and that right "will be judicially taken away . . . only after preponderating proof of [his] lack of mental capacity to manage [his] own business affairs."). Accordingly, we reverse the order denying M.E.'s petition for review and remand for the entry of an order consistent with the dictates of this Opinion.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/19/2026